No. 24-50128

# In the United States Court of Appeals for the Fifth Circuit

LEAGUE OF UNITED LATIN AMERICAN CITIZENS; SOUTHWEST VOTER REGISTRATION EDUCATION PROJECT; MI FAMILIA VOTA; AMERICAN GI FORUM OF TEXAS; LA UNION DEL PUEBLO ENTERO; MEXICAN AMERICAN BAR ASSOCIATION OF TEXAS; TEXAS HISPANICS ORGANIZED FOR POLITICAL EDUCATION; WILLIAM C. VELASQUEZ INSTITUTE; FIEL HOUSTON, INCORPORATED; TEXAS ASSOCIATION OF LATINO ADMINISTRATORS AND SUPERINTENDENTS; EMELDA MENENDEZ; GILBERTO MENENDEZ; JOSE OLIVARES; FLORINDA CHAVEZ; JOEY CARDENAS; PROYECTO AZTECA; REFORM IMMIGRATION FOR TEXAS ALLIANCE; WORKERS DEFENSE PROJECT; PAULITA SANCHEZ; JO ANN ACEVEDO; DAVID LOPEZ; DIANA MARTINEZ ALEXANDER; JEANDRA ORTIZ,

*Plaintiffs-Appellants*,

*v.*

GREG ABBOTT, IN HIS OFFICIAL CAPACITY AS GOVERNOR OF THE STATE OF TEXAS,

*Defendant-Appellee*

*and*

LIEUTENANT GOVERNOR DAN PATRICK; SPEAKER OF THE TEXAS HOUSE OF REPRESENTATIVES REP. DADE PHELAN; SEN. JOAN HUFFMAN; SEN. BRYAN HUGHES; SEN. PAUL BETTENCOURT; SEN. DONNA CAMPBELL; SEN. JANE NELSON; SEN. BRIAN BIRDWELL; SEN. CHARLES PERRY; SEN. ROBERT NICHOLS; SEN. KELLY HANCOCK; REP. TODD HUNTER; REP. BROOKS LANDGRAF; REP. J.M. LOZANO; REP. JACEY JETTON; REP. RYAN GUILLEN; REP. MIKE SCHOFIELD; REP. ANDREW MURR; REP. DAN HUBERTY; REP. HUGH SHINE; REP. BRAD BUCKLEY; SHARON CARTER; ANNA MACKIN; SEAN OPPERMAN; CHRIS GOBER; COLLEEN GARCIA; ADAM FOLTZ,

*Third-Party Respondents-Appellees.*

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

STATE OF TEXAS; JANE NELSON, IN HER OFFICIAL CAPACITY AS
TEXAS SECRETARY OF STATE,

*Defendants-Appellees.*

————

On Appeal from the United States District Court
for the Western District of Texas, San Antonio Division

————

## BRIEF FOR DEFENDANTS-APPELLEES

————

Taylor A.R. Meehan
Frank H. Chang
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Suite 700
Arlington, VA 22209
Tel: (703) 243-9423
taylor@consovoymccarthy.com
frank@consovoymccarthy.com

Patrick N. Strawbridge
CONSOVOY MCCARTHY PLLC
Ten Post Office Square
8th Floor South PMB #706
Boston, MA 02109
Tel: (703) 243-9423
patrick@consovoymccarthy.com

*Counsel for House Third-Party
Respondents-Appellees*

Ken Paxton
Attorney General of Texas

Brent Webster
First Assistant Attorney General

Aaron L. Nielson
Solicitor General

Lanora C. Pettit
Principal Deputy Solicitor General
Lanora.Pettit@oag.texas.gov

William F. Cole
Deputy Solicitor General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

*Counsel for Defendants-Appellees*

# Certificate of Interested Persons

No. 24-50128

League of United Latin American Citizens; Southwest Voter Registration Education Project; Mi Familia Vota; American GI Forum of Texas; La Union del Pueblo Entero; Mexican American Bar Association of Texas; Texas Hispanics Organized for Political Education; William C. Velasquez Institute; Fiel Houston, Incorporated; Texas Association of Latino Administrators and Superintendents; Emelda Menendez; Gilberto Menendez; Jose Olivares; Florinda Chavez; Joey Cardenas; Proyecto Azteca; Reform Immigration for Texas Alliance; Workers Defense Project; Paulita Sanchez; Jo Ann Acevedo; David Lopez; Diana Martinez Alexander; Jeandra Ortiz,

*Plaintiffs-Appellants*,

*v.*

Greg Abbott, in His Official Capacity as Governor of the State of Texas,

*Defendant-Appellee*

*and*

Lieutenant Governor Dan Patrick; Speaker of the Texas House of Representatives Rep. Dade Phelan; Sen. Joan Huffman; Sen. Bryan Hughes; Sen. Paul Bettencourt; Sen. Donna Campbell; Sen. Jane Nelson; Sen. Brian Birdwell; Sen. Charles Perry; Sen. Robert Nichols; Sen. Kelly Hancock; Rep. Todd Hunter; Rep. Brooks Landgraf; Rep. J.M. Lozano; Rep. Jacey Jetton; Rep. Ryan Guillen; Rep. Mike Schofield; Rep. Andrew Murr; Rep. Dan Huberty; Rep. Hugh Shine; Rep. Brad Buckley; Sharon Carter; Anna Mackin; Sean Opperman; Chris Gober; Colleen Garcia; Adam Foltz,

*Third-Party Respondents-Appellees.*

---

i

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

STATE OF TEXAS; JANE NELSON, IN HER OFFICIAL CAPACITY AS TEXAS SECRETARY OF STATE,

*Defendants-Appellees.*

Under the fourth sentence of Fifth Circuit Rule 28.2.1, Defendants-Appellees, as governmental parties, need not furnish a certificate of interested persons.

/s/ Lanora C. Pettit
LANORA C. PETTIT
*Counsel of Record for*
*Defendants-Appellees*

## Statement Regarding Oral Argument

The legislative privilege implicates the separation of powers and a legislator's right to perform his legislative duties without the risk of being forced to answer in court for every bill he introduces, every vote he casts, or every conversation he has with an aide, constituent, or other interested party. *See La Union Del Pueblo Entero v. Abbott*, 68 F.4th 228, 237 (5th Cir. 2023). Ordinarily, a case implicating such fundamental concerns would merit oral argument in this Court—particularly given the extensive evidentiary record at issue. But the legal arguments that Appellants raise have been thoroughly vetted and unequivocally rejected by multiple appellate courts across the country in recent years, including this one. Given the now established law in this Circuit and others, Appellees respectfully suggest that oral argument will not aid in the Court's decisional process. If the Court disagrees, Appellees respectfully request leave to participate.

# Table of Contents

Page

Certificate of Interested Persons ................................................................i

Statement Regarding Oral Argument ......................................................iii

Table of Authorities ..................................................................................vi

Introduction ................................................................................................ 1

Jurisdiction ................................................................................................. 3

Statement of Issues ..................................................................................... 3

Statement of the Case ................................................................................. 4

    I.   Factual Background ........................................................................... 4

        A.  The 2021 Redistricting Process ............................................ 4

        B.  The 2023 Redistricting Process ............................................ 8

    II.  Procedural Background ..................................................................... 9

Summary of the Argument .........................................................................12

Standard of Review ....................................................................................14

Argument ...................................................................................................15

    I.   This Court Lacks Jurisdiction to Consider Appellants' Discovery
       Dispute ..........................................................................................15

        A.  Appellants did not file a timely notice of appeal regarding the
            district court's December 2023 order ..................................15

        B.  This appeal falls outside the class of cases over which this
            Court has exercised collateral-order jurisdiction ...............16

    II.  The Legislative Privilege Protects All Materials Within the
       Legislative Process ........................................................................20

        A.  For centuries, the privilege has safeguarded legislative
            independence ........................................................................21

        B.  Appellants seek material that falls within the scope of that
            privilege ................................................................................22

        C.  None of the four ways that Appellants try to limit the scope
            of the privilege can be squared with precedent ..................25

            1.   The privilege extends to factual materials ..................25

2.  The privilege covers information and communications made part of the legislative process—not specific records .......... 30

3.  The scope of the privilege does not turn on the custodian of specific records .......................................................................... 34

4.  Courts have never defined the scope of the privilege based on what litigants later define as the relevant "enactment period" ........................................................................................... 35

III.  The Legislative Privilege Has Not Been Waived ...................................... 37

IV.  The Legislative Privilege Does Not Yield to Claims of Discriminatory Redistricting ................................................................... 40

Conclusion ........................................................................................................................ 46

Certificate of Service ................................................................................................. 47

Certificate of Compliance ...................................................................................... 47

# Table of Authorities

Page(s)

**Cases:**

*In re Abbott*,
    628 S.W.3d 288 (Tex. 2021) ...................................................................7

*Abbott v. Mexican Am. Legis. Caucus, Tex. House of Representatives*,
    647 S.W.3d 681 (Tex. 2022) .............................................................8, 9

*Adams v. Mem'l Hermann*,
    973 F.3d 343 (5th Cir. 2020) ............................................................. 28

*Almonte v. City of Long Beach*,
    478 F.4th 100 (2d Cir. 2007) ..............................................................35

*Am. Trucking Ass'ns v. Alviti*,
    14 F.4th 76 (1st Cir. 2021) ........................................................1, 23, 32

*Banca Pueyo SA v. Lone Star Fund IX (U.S.), L.P.*,
    978 F.3d 968 (5th Cir. 2020) ............................................................. 17

*Bethune-Hill v. Va. State Bd. of Elections*,
    114 F. Supp. 3d 323 (E.D. Va. 2015) ........................................... 29, 41

*Bogan v. Scott-Harris*,
    523 U.S. 44 (1998) .............................................................................26

*Bruce v. Riddle*,
    631 F.2d 272 (4th Cir. 1980) ..............................................................38

*Citizens for Good Gov't v. City of Quitman*,
    148 F.3d 472 (5th Cir. 1998) ............................................................. 24

*Citizens Union of City of N.Y. v. Att'y Gen. of N.Y.*,
    269 F. Supp. 3d 124 (S.D.N.Y. 2017) ...............................................29

*Common Cause Fla. v. Byrd*,
    674 F. Supp. 3d 1097 (N.D. Fla. 2023) ...............................................1

*Cox v. Adm'r U.S. Steel & Carnegie*,
    17 F.3d 1386 (11th Cir. 1994) .......................................................... 28

*In re Dallas County*,
    697 S.W.3d 142 (Tex. 2024) ............................................................. 15

*Dep't of Transp. v. Ass'n of Am. R.Rs.*,
    575 U.S. 43 (2015) ...................................................................... 33, 36

*Eastland v. U.S. Servicemen's Fund*,
    421 U.S. 491 (1975) .......................................................................... 28

*Evenwel v. Abbott*,
  578 U.S. 54 (2016) ................................................................5

*Fla. Common Cause v. Byrd*,
  674 F. Supp. 3d 1097 (N.D. Fla. 2023) ............................... 41

*Flores v. Garland*,
  72 F.4th 85 (5th Cir. 2023) ................................................. 41

*Goddard v. United States*,
  131 F.2d 220 (5th Cir. 1942) .............................................. 18

*Gov't of Virgin Islands v. Lee*,
  775 F.2d 514 (3d Cir. 1985) ........................................... 26, 28

*Gravel v. United States*,
  408 U.S. 606 (1972) .............................................. 1, 21, 26, 27

*Guillen v. LULAC*,
  142 S. Ct. 2773 (2022) ........................................................ 39

*Hall v. Hall*,
  584 U.S. 59 (2018) ............................................................. 15

*Harmon v. Dallas County*,
  927 F.3d 884 (5th Cir. 2019) .............................................. 17

*Hickman v. Taylor*,
  329 U.S. 495 (1947) ........................................................... 28

*In re Hubbard*,
  803 F.3d 1298 (11th Cir. 2015) .................................... *passim*

*Indus. Clearinghouse, Inc. v. Browning Mfg. Div. of Emerson Elec. Co.*,
  953 F.2d 1004 (5th Cir. 1992) ............................................. 39

*Jackson Mun. Airport Auth. v. Harkins*,
  67 F.4th 678 (5th Cir. 2023),
  *vacated as moot on rehearing*, 98 F.4th 144 (5th Cir. 2024) ............................ 1, 16

*Jefferson Cmty. Health Care Ctrs., Inc. v. Jefferson Par. Gov't*,
  849 F.3d 615 (5th Cir. 2017) ...................................... *passim*

*Kilbourn v. Thompson*,
  103 U.S. 168 (1880) .................................................. 20, 21, 29

*In re Kincaid*,
  No. 22-mc-67, 2023 WL 6459801 (D.D.C. Oct. 4, 2023) ................................ 12

*In re Landry*,
  83 F.4th 300 (5th Cir. 2023) .............................................. 45

*La Union Del Pueblo Entero v. Abbott*,
    68 F.4th 228 (5th Cir. 2023) ................................................. *passim*

*La Union del Pueblo Entero v. Abbott*,
    93 F.4th 310 (5th Cir. 2024) ................................................. *passim*

*La Union Del Pueblo Entero v. Abbott*,
    No. SA-21-CV-00844, 2022 WL 1667687 (W.D. Tex. May 25, 2022) ...........10

*Lee v. City of Los Angeles*,
    908 F.3d 1175 (9th Cir. 2018) ................................................. *passim*

*Leonard v. Martin*,
    38 F.4th 481 (5th Cir. 2022) .............................................. 13, 16, 18

*Lewis v. Crochet*,
    105 F.4th 272 (5th Cir. 2024) ....................................................39

*Marceaux v. Lafayette City-Par. Consol. Gov't*,
    731 F.3d 488 (5th Cir. 2013) .....................................................15

*Marylanders for Fair Representation, Inc. v. Schaefer*,
    144 F.R.D. 292 (D. Md. 1992) ....................................................41

*Miller v. Johnson*,
    515 U.S. 900 (1995) ..............................................................7

*Miller v. Transamerican Press, Inc.*,
    709 F.2d 524 (9th Cir. 1983) ....................................................29

*Mohawk Indus., Inc. v. Carpenter*,
    558 U.S. 100 (2009) ...................................................13, 16, 18, 19

*In re N.D. Legis. Assembly*,
    70 F.4th 460 (8th Cir. 2023) ............................................... *passim*

*N. Pipeline Const. Co. v. Marathon Pipe Line Co.*,
    458 U.S. 50 (1982) ............................................................ 42

*Newman v. Plains All Am. Pipeline, L.P.*,
    23 F.4th 393 (5th Cir. 2022) .....................................................43

*In re Pac. Pictures Corp.*,
    679 F.3d 1121 (9th Cir. 2012) ...................................................39

*Perez v. Perry*,
    No. SA-11-CV-00360, 2014 WL 106927 (W.D. Tex. Jan. 8, 2014) .................. 11

*Pernell v. Fla. Bd. of Govs. of State Univ.*,
    84 F.4th 1339 (11th Cir. 2023) ............................................ *passim*

*In re Perry*,
    60 S.W.3d 857 (Tex. 2001) ..................................................... 24

*Republican Party of Minn. v. White*,
    536 U.S. 765 (2002) ...................................................................... 37

*Reynolds v. Sims*,
    377 U.S. 533 (1964) ........................................................................ 4

*Rodriguez v. Pataki*,
    280 F. Supp. 2d 89 (S.D.N.Y. 2003) ...................................... 10, 40

*Rohm & Hass Tex., Inc. v. Ortiz Bros. Insulation, Inc.*,
    32 F.3d 205 (5th Cir. 1994) ........................................................ 43

*S. Pac. Transp. Co. v. San Antonio ex rel. City Pub. Serv. Bd.*,
    748 F.2d 266 (5th Cir. 1984) ...................................................... 19

*In re Sealed Case*,
    121 F.3d 729 (D.C. Cir. 1997) .................................................... 28

*Siler v. Env't Prot. Agency*,
    908 F.3d 1291 (Fed. Cir. 2018) .................................................. 18

*Smith v. Iowa Dist. Ct. for Polk Cnty.*,
    3 N.W.3d 524 (Iowa 2024) ............................................................ 1

*Stokes v. Sw. Airlines*,
    887 F.3d 199 (5th Cir. 2018) ...................................................... 20

*Sup. Ct. of Va. v. Consumers Union of U.S., Inc.*,
    446 U.S. 719 (1980) .................................................................... 22

*Tenney v. Brandhove*,
    341 U.S. 367 (1951) .............................................................. *passim*

*Turtle Mountain Band of Chippewa Indians v. N.D. Legis. Assembly*,
    144 S. Ct. 2709 (2024) .................................................................. 1

*United States v. Brewster*,
    408 U.S. 501 (1972) .............................................................. *passim*

*United States v. Gillock*,
    445 U.S. 360 (1980) ...................................... 14, 22, 23, 24, 40

*United States v. Helstoski*,
    442 U.S. 477 (1979) .............................................................. *passim*

*United States v. Johnson*,
    383 U.S. 169 (1966) .................................................................... 20

*United States v. Johnson*,
    702 F. App'x 815 (11th Cir. 2017) ............................................ 27

*United States v. Seale*,
    600 F.3d 473 (5th Cir. 2010) ...................................................... 32

*United States v. Segura*,
   747 F.3d 323 (5th Cir. 2014) ........................................................ 44
*United States v. Tenorio-Angel*,
   756 F.2d 1505 (11th Cir. 1985) ................................................... 27
*Upjohn Co. v. United States*,
   449 U.S. 383 (1981) ............................................................ 28, 31
*Vantage Health Plan, Inc. v. Willis-Knighton Med. Ctr.*,
   913 F.3d 443 (5th Cir. 2019) ....................................................... 17
*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
   429 U.S. 252 (1977) ................................................ 23, 40, 41, 43
*Whole Woman's Health v. Smith*,
   896 F.3d 362 (5th Cir. 2018) ......................................... 14, 17, 18, 19
*Wiwa v. Royal Dutch Petrol. Co.*,
   392 F.3d 812 (5th Cir. 2004) ....................................................... 14

**Constitutional Provisions, Statutes, and Rules:**

U.S. Const.:
   art. I, § 2, cl. 3 ........................................................................ 4
   art. I, § 4, cl. 1 ...................................................................... 24
   art. I, § 6 ............................................................................... 22
Tex. Const.:
   art. III, § 5(a) .......................................................................... 5
   art. III, § 24(b) ........................................................................ 5
   art. III, § 25 ............................................................................ 4
   art. III, § 26 ......................................................................... 4, 5
   art. III, § 28 ......................................................................... 4, 8
   art. III, § 40 ............................................................................ 8
13 U.S.C. § 141(a) ..................................................................... 4
28 U.S.C.:
   § 1291 .............................................................................. 3, 16
   § 1331 ................................................................................... 3
   § 1343(a)(3)-(4) ..................................................................... 3
   § 2201 ................................................................................... 3
   § 2202 ................................................................................... 3

Fed. R. Civ. P:
    26(b)(1)................................................................................14
    37(a)....................................................................................14
Tex. Gov. Proclamation No. 41-3858, 87th Leg., 3d C.S. (2021),
    46 Tex. Reg. 5983, 5989 ...................................................6

**Other Authorities:**
16A Charles Alen Wright et al., Fed. Prac. & Proc. § 3950.2 (5th ed. 2024) ..........16
*87th Regular Session*, Legis. Reference Libr. of Tex.,
    https://perma.cc/5NW7-4Z57 ............................................5
Appellants' Opening Brief, *La Union del Pueblo Entero v. Abbott*,
    93 F.4th 310 (5th Cir. 2024) (No. 23-50201) ............................20, 30
Appellants' Opening Brief, *La Union Del Pueblo Entero v. Abbott*,
    68 F.4th 228 (5th Cir. 2023) (No. 22-50435)....................................31
Appellants' Reply Brief, *La Union Del Pueblo Entero v. Abbott*,
    68 F.4th 228 (5th Cir. 2023) (No. 22-50435)....................................20
*Biennial Revenue Estimate for Texas*, Tex. Comptroller of Pub. Accts.,
    https://perma.cc/YS9T-5XE9.................................................36
*Black's Law Dictionary* (10th ed. 2014) ..................................................35
Brief for Plaintiffs-Appellees, *La Union del Pueblo Entero v. Abbott*,
    93 F.4th 310 (5th Cir. 2024) (No. 23-50201) ..................................20
Brief of the LULAC Plaintiffs as Appellees, *La Union Del Pueblo Entero v.
    Abbott*, 68 F.4th 228 (5th Cir. 2023)...........................................20
Christopher Asta, Note, *Developing a Speech or Debate Clause Framework
    for Redistricting Litigation*, 89 N.Y.U. L. Rev. 238 (2014) ...............42
*Decennial Census P.L. 94-171 Redistricting Data*, U.S. Census Bureau
    (Nov. 29, 2023), https://perma.cc/9GRH-7D2S..............................5
Farah Eltohamy, *What It Means to Break Quorum and What You Need to
    Know About the Texas House Democrats' Dramatic Departure*, Texas
    Tribune (July 14, 2021), https://perma.cc/3CP6-YQK6.....................7
House Bill 1.....................................................................................6, 9
House Bill 1000..................................................................................9
John Hart Ely, *Democracy and Distrust: A Theory of Judicial Review* (1980) ..........42
Joseph Story, *Commentaries on the Constitution of the United States* (1833) .............27
Oral Argument Recording, *La Union Del Pueblo Entero v. Abbott,*
    68 F.4th 228 (5th Cir. 2023) ..................................................20

Order, *Petersen v. U.S. Dist. Ct. for the Dist. of Ariz.*, No. 24-4335 (9th Cir. Aug. 8, 2024) ......................................................................................... 1

Press Release, U.S. Census Bureau, Census Bureau Statement on Redistricting Data Timeline (Feb. 12, 2021), https://perma.cc/P76J-HMYV ................................................................................................... 5

Senate Bill 4 ............................................................................................ 6, 9

Senate Bill 6 ................................................................................................. 6

Senate Bill 7 ................................................................................................. 6

Senate Bill 375 ............................................................................................. 9

Senate District 10 .................................................................................... 6, 7

*Senate Notice of Public Hearing*, Tex. Legislature Online, https://perma.cc/N9LW-8VF5 .................................................................. 36

Stay Order, *LULAC v. Patrick*, No. 22-50662 (5th Cir. July 27, 2022) ................. 10

*The Federalist* No. 51 (James Madison) (Clinton Rossiter ed., 1961) ..................... 42

Unpublished Order, *LULAC v. Patrick*, No. 22-50662 (5th Cir. July 18, 2023) ......................................................................................................... 11

# Introduction

For centuries, the legislative privilege has protected lawmakers, first in Britain, then in America, "from arrest or civil process for what they do or say in legislative proceedings." *Tenney v. Brandhove*, 341 U.S. 367, 372 (1951). When it applies, a legislator "may not be made to answer—either in terms of questions *or* in terms of defending himself from prosecution." *Gravel v. United States*, 408 U.S. 606, 616 (1972) (emphasis added). And as this Court has emphasized three times in the last two years, the circumstances in which the privilege applies are "necessarily broad"— covering any inquiry into a legislator's actions "within 'the sphere of legitimate legislative activity.'" *La Union Del Pueblo Entero v. Abbott* (*Hughes*), 68 F.4th 228, 235 (5th Cir. 2023) (quoting *Tenney*, 341 U.S. at 376); *see also La Union del Pueblo Entero v. Abbott* (*Bettencourt*), 93 F.4th 310, 322 (5th Cir. 2024); *Jackson Mun. Airport Auth. v. Harkins*, 67 F.4th 678, 687 (5th Cir. 2023), *vacated as moot on rehearing*, 98 F.4th 144 (5th Cir. 2024). In this, the Court is far from alone: In last five years, broad consensus has emerged among this Court's sister circuits that efforts to breach this centuries-old legislative prerogative are impermissible,[1] including in redistricting cases.[2]

---

[1] *Pernell v. Fla. Bd. of Govs. of State Univ.*, 84 F.4th 1339 (11th Cir. 2023); *Am. Trucking Ass'ns v. Alviti*, 14 F.4th 76 (1st Cir. 2021); *In re Hubbard*, 803 F.3d 1298 (11th Cir. 2015); *accord Smith v. Iowa Dist. Ct. for Polk Cnty.*, 3 N.W.3d 524 (Iowa 2024). *But see* Order, *Petersen v. U.S. Dist. Ct. for the Dist. of Ariz.*, No. 24-4335 (9th Cir. Aug. 8, 2024).

[2] *In re N.D. Legis. Assembly*, 70 F.4th 460 (8th Cir. 2023), *vacated as moot sub. nom. Turtle Mountain Band of Chippewa Indians v. N.D. Legis. Assembly*, 144 S. Ct. 2709 (2024); *Lee v. City of Los Angeles*, 908 F.3d 1175 (9th Cir. 2018); *see also Common Cause Fla. v. Byrd*, 674 F. Supp. 3d 1097, 1105 (N.D. Fla. 2023) (three-judge panel).

As this Court recognized in *Hughes*, the legislative privilege protects legislators and the legislative process from the very intrusion that Appellants imposed on Texas legislators here. In the decision before the Court, Judge Smith applied this Court's precedent—which goes largely unmentioned in Appellants' opening brief—to the over 1,200 documents that Appellants were permitted to subpoena and thousands of pages of deposition transcripts that they were permitted to take before *Hughes* was decided. ROA.23596-937. Although Appellees might quibble at the margins of his analysis, Judge Smith correctly concluded that most of the documents and transcripts are privileged. That should not be surprising: Judge Smith also wrote *Bettencourt*, in which this Court explained that the privilege "guard[s] against 'judicial interference' by protecting legislators from courts[] seeking to 'inquire into the motives of legislators' and 'uncover a legislator's subjective intent in drafting, supporting, or opposing proposed or enacted legislation.'" 93 F.4th at 317 (quoting *Hughes*, 68 F.4th at 238).

Nevertheless, Appellants' opening brief raises a hodgepodge of reasons—many of them in a highly conclusory fashion—suggesting that Judge Smith somehow misunderstood (or, at least, misapplied) his own opinion. These reasons range from asserting that the legislative privilege does not extend to factual materials to claiming that *Bettencourt* violated the rule of orderliness when it followed this Court's clear holding in *Hughes* rather than vague dicta in *Jefferson Community*. *See Jefferson Cmty. Health Care Ctrs., Inc. v. Jefferson Par. Gov't*, 849 F.3d 615 (5th Cir. 2017). Each is without merit, and many of these arguments have already been rejected by this Court, its sister circuits, or both. As Judge Smith correctly explained, because the

legislative privilege was created to protect the legislative process, its scope turns on whether a document was created "within the legislative process," ROA.23580—not the identity of the custodian or the date on which it was created. Moreover, the privilege is *not* waived merely because a document is shown to third parties, and the privilege does not yield just because this case involves redistricting.

## JURISDICTION

The district court has jurisdiction under 28 U.S.C. §§ 1331, 1343(a)(3)-(4), 2201 and 2202. Although Appellants invoke this Court's jurisdiction under 28 U.S.C. § 1291, the Court lacks jurisdiction in whole or in part for the reasons discussed in Part I.

## STATEMENT OF ISSUES

**1.** Whether this Court has collateral-order jurisdiction over an appeal filed by a party to the underlying litigation more than 30 days after the issuance of the discovery order in dispute.

**2.** Whether, assuming the Court has jurisdiction, the challenged documents and testimony arise from the "sphere of legitimate legislative activity" and thus fall within the "necessarily broad" scope that this Court has recognized for the legislative privilege. *Hughes*, 68 F.4th at 235-36.

**3.** Whether Appellants have demonstrated that the trial court abused its discretion in rejecting Appellants' waiver arguments based on legislators' (1) provision of the materials to third parties during the legislative process or (2) failure to object to certain questions in other depositions.

**4.**    Whether the qualified nature of the legislative privilege creates an exemption for claims of racial gerrymandering when it does not do so for other claims of racially discriminatory voting practices.

### STATEMENT OF THE CASE

## I.    Factual Background

### A.    The 2021 Redistricting Process

**1.**    Under federal law, the U.S. Census Bureau must release a "decennial census of [the] population" on April 1 "every 10 years." 13 U.S.C. § 141(a); *see also* U.S. Const. art. I, § 2, cl. 3 (empowering Congress to carry out the census "in such Manner as they shall by Law direct"). Like other States, Texas uses this data to reapportion seats for its legislature, thereby ensuring its election districts reflect changes in population as required both by state law, *see* Tex. Const. art. III, § 28, and the one-person, one-vote principle announced by the U.S. Supreme Court, *see Reynolds v. Sims*, 377 U.S. 533, 558 (1964).

Specifically, the Texas Constitution provides that "[t]he Legislature shall, at its first regular session after the publication of each United States decennial census, apportion the state into senatorial and representative districts, agreeable to the provisions of Sections 25 and 26 of" Article III of the Constitution. Tex. Const. art. III, § 28. Section 25 requires that "[t]he State shall be divided into Senatorial Districts of contiguous territory." *Id.* § 25. Section 26 requires that the House "shall be apportioned among the several counties" based "on a ratio obtained by dividing the population of the State, as ascertained by the most recent United States census, by

4

the number of members of which the House is composed." *Id.* § 26. Where "one county has more than sufficient population to be entitled to one or more representatives, such representative or representatives shall be apportioned to such county, and for any surplus of population it may be joined in a Representative District with any other contiguous county or counties." *Id.*

    **2.** In 2021, due to "COVID-19-related delays," the U.S. Census Bureau missed its statutory deadline for releasing the census data on April 1. Press Release, U.S. Census Bureau, Census Bureau Statement on Redistricting Data Timeline (Feb. 12, 2021), https://perma.cc/P76J-HMYV. The agency first provided redistricting data for all states on August 12, 2021, and then committed to providing the "full redistricting toolkit on September 16, 2021." *Decennial Census P.L. 94-171 Redistricting Data*, U.S. Census Bureau (Nov. 29, 2023), https://perma.cc/9GRH-7D2S.

    The delayed release of the census data meant that the Texas Legislature could not begin the redistricting process during its 87th regular session, which ran from January 12, 2021, to May 31, 2021. *87th Regular Session*, Legis. Reference Libr. of Tex., https://perma.cc/5NW7-4Z57; *see also* Tex. Const. art. III, §§ 5(a), 24(b). Given Texas's significant change in population, it would have violated federal law for Texas to have continued to use the 2011 maps for the forthcoming 2022 elections. *See Evenwel v. Abbott*, 578 U.S. 54, 59 (2016) ("[J]urisdictions must design both congressional and state-legislative districts with equal populations, and must regularly reapportion districts to prevent malapportionment."). To avoid this outcome, on September 7, 2021, Governor Greg Abbott called a special session of the Legislature,

to begin on September 20, 2021, that would tackle redistricting. Tex. Gov. Proclamation No. 41-3858, 87th Leg., 3d C.S. (2021), 46 Tex. Reg. 5983, 5989.

During that special session, the Legislature redrew the district lines for the state House of Representatives and Senate in several counties throughout Texas based on the newly received census data. *See, e.g.*, ROA.7637. In October 2021, the Legislature passed House Bill 1, which reapportioned the districts for the Texas House of Representatives, ROA.7637; Senate Bill 4, which reapportioned the districts for the Texas Senate, ROA.7678; Senate Bill 6, which reapportioned the districts for Texas's congressional delegation, ROA.7719; and Senate Bill 7, which reapportioned the districts for the State Board of Education, ROA.7763. The Governor signed each of these bills into law later that month. ROA.507-08.

**3.** Discussions regarding the district lines, however, began well before the special session in which they were passed. For example, Appellants allude to preliminary-injunction proceedings. LULAC.Br.36-37. As the district court discussed in its preliminary-injunction decision, those proceedings involved a single senatorial district: Senate District 10 (SD 10), which based on its "benchmark" iteration drawn from 2010-census data, was located "entirely within" Tarrant County. ROA.7022. SD 10 had been politically competitive "for at least two decades," ROA.7023, and the record reflects that the topic of SD 10's district lines was broached between staffers for Senator Joan Huffman, the chair of the Texas Senate's redistricting

committee, and Senator Beverly Powell, the incumbent senator for SD 10, no later than February 12, 2020, ROA.7027.[3]

During initial meetings, which predated the release of the census data, Senator Huffman's chief of staff told his counterpart in Senator Powell's office to "expect 'very little change' because SD 10 was already close to ideal size." ROA.7027. But in the coming months, partisan rancor in Texas became famously heated. To avoid voting on legislation unrelated to redistricting, numerous Democratic legislators fled the jurisdiction.[4] They returned to work only after the Texas Supreme Court held that truant Democrats could be arrested and compelled to attend to the business of the people of Texas. *See generally In re Abbott*, 628 S.W.3d 288 (Tex. 2021) (orig. proceeding).

Nevertheless, as Appellants admit, the Legislature went to great lengths to draw the "race blind" maps required by the Constitution while simultaneously preserving existing Black and Latino majority districts as require by the Voting Rights Act (VRA). *See* LULAC.Br.3; *e.g.*, *Miller v. Johnson*, 515 U.S. 900, 915-16 (1995) (noting the difficulties this dual requirement inserts into redistricting).

---

[3] For the avoidance of doubt, Appellees do not concede that this the material discussed in the preliminary-injunction hearing was properly ordered produced under *Hughes*. Appellees here discuss it only because Appellants' account of the results of that hearing, *see* LULAC.Br.36-37, is incomplete if not entirely misleading.

[4] Farah Eltohamy, *What It Means to Break Quorum and What You Need to Know About the Texas House Democrats' Dramatic Departure*, Tex. Tribune (July 14, 2021), https://perma.cc/3CP6-YQK6.

**B.  The 2023 Redistricting Process**

Although Appellants mention it nowhere in their brief, the 2021 redistricting process did not mark the end of the Legislature's redistricting efforts for this decennial period. Because the Texas Constitution requires that "[t]he Legislature shall, at its first *regular* session after the publication of each United States decennial census apportion the state into senatorial and representative districts," Tex. Const. art. III, § 28 (emphasis added), the fact that "the COVID-19 pandemic caused the Census Bureau to miss the April 1 deadline for release of the data from the 2020 census," put Texas in an immediate bind, *Abbott v. Mexican Am. Legis. Caucus, Tex. House of Representatives (MALC)*, 647 S.W.3d 681, 687 (Tex. 2022).

To avoid "violat[ing] the *U.S.* Constitution and thus open[ing] the State to malapportionment challenges under federal law," Texas conducted its redistricting process during a special session, *id.* at 701 (emphasis added), which is limited to 30 days by the Texas Constitution, Tex. Const. art. III, § 40. But that did not save Texas from litigation over whether the Texas Constitution required the Legislature use the 2011 maps until 2023, *see MALC*, 647 S.W.3d at 689—or, for that matter, from accusations that modifications to the ordinary rules of procedure to accommodate the timeline of a special session evidenced racial animus, *e.g.*, LULAC.Br.31-32.

At the same time, Texas remained cognizant that it needed to redistrict during the next regular session in 2023 to comply with its independent obligations under the Texas Constitution. On behalf of Texas, the Office of the Attorney General "assure[d the Texas Supreme Court] that the 88th Legislature w[ould] discharge that obligation in its regular session in early 2023, well before the 2024 election cycle."

*MALC*, 647 S.W.3d at 707 (Hecht, C.J., dissenting). And, as other plaintiffs in the consolidated action (who are not parties to this appeal) acknowledged in their recently filed supplemental complaints, the 88th Legislature in fact did so. *See* ROA.70876, 71548-52. Those proceedings culminated in the passage of House Bill 1000 and Senate Bill 375, which adopted the same lines for state House and Senate districts originally enacted as House Bill 1 and Senate Bill 4, respectively. Although they make no appearance in Appellants' brief, House Bill 1000 and Senate Bill 375 represent the permanent districts for the House and Senate for this decennium.

## II. Procedural Background

After the census, Appellants, other private plaintiffs' groups, and the United States brought various federal lawsuits to challenge Texas's legislative, congressional, and State Board of Education districts adopted in 2021. But after passage of the 2023 legislation, Appellants never updated their pleadings to challenge House Bill 1000 or Senate Bill 375. *See generally* ROA.22938-23130. Instead, they continue to challenge statutes that the Legislature passed in October 2021. ROA.22941-42. In their operative complaints, they allege that "[a]ll four statewide redistricting plans enacted in 2021 discriminate—purposefully and in effect—against Latino voters in violation of the federal Voting Rights Act and the U.S. Constitution." ROA.22942. At least two of Appellants' three claims turn expressly on the intent of the *87th* rather than the *88th* Legislature. *E.g.*, ROA.23125-26; *accord* LULAC.Br.4. And this appeal arises out of two orders denying Appellants' demands for what they describe as "exactly the information that has led to findings of intentional racial discrimination in past cases." LULAC.Br.16.

9

*First*, Appellants, other plaintiffs' groups, and the United States subpoenaed redistricting-related documents from legislators and staff. *E.g.*, ROA.15738-39. Applying the same approach as the *district* court in *Hughes*, the district court here initially granted in large part a motion from the United States to compel documents withheld for privilege, ROA.11092-108, and ordered the production of documents. ROA.16631-33;[5] ROA.16612-16 (relying on *La Union Del Pueblo Entero v. Abbott* (*LUPE*), No. SA-21-CV-00844, 2022 WL 1667687, at *6-7 (W.D. Tex. May 25, 2022), *rev'd*, 68 F.4th at 228). The *Hughes* district court had applied a five-factor balancing test to determine whether the plaintiffs there were entitled to discovery about the subjective intention of members of the Texas Legislature. *See LUPE*, 2022 WL 1667687 at *2 (adopting the balancing-test framework used in *Rodriguez v. Pataki*, 280 F. Supp. 2d 89, 100 (S.D.N.Y. 2003)). Several Legislators immediately appealed and sought a stay of the order compelling disclosure of documents, ROA.17388-90, which this Court granted pending *Hughes*, Stay Order, *LULAC v. Patrick*, No. 22-50662 (5th Cir. July 27, 2022), ECF No. 30-2.

In *Hughes*, this Court expressly rejected the notion at the center of the district court's earlier order that, because *Jefferson Community* had described the legislative privilege as "qualified," application of the privilege depends on a multi-factor test that balances the legislators' interests in keeping information private against the plaintiffs' desire for the documents. *See Hughes*, 68 F.4th at 240 & n.84 (noting that

---

[5] Appellants served similar subpoenas and similar motions to compel. *See* ROA.15738-53, 20138-49.

*Jefferson Community* had not adopted the multi-factor test discussed in *Perez v. Perry*, No. SA-11-CV-00360, 2014 WL 106927 (W.D. Tex. Jan. 8, 2014)).

This Court vacated the panel's earlier discovery order for reconsideration in light of *Hughes*. *See* Unpublished Order at 11, *Patrick*, No. 22-50662 (5th Cir. July 18, 2023), ECF No. 107-1. In the order currently before the Court, the three-judge panel granted in part and denied in part sixteen pending motions to compel. ROA.23593-94. In doing so, the panel set aside its earlier reliance on the balancing test used by the *Hughes* district court in favor of reliance on *this* Court's decision in *Hughes*. ROA.23578-80.

As well as seeking the production of documents, the plaintiffs in this case also sought deposition testimony from 24 Texas legislators, legislative staff, and others. Pursuant to a procedure laid out by the district court, deposition transcripts were "seal[ed]" to allow the Court later to determine whether individual questions inappropriately delved into privileged matter. ROA.7511-12. In its December 2023 order, the district court upheld the vast majority of the legislators' privilege assertions and overruled others. *See* ROA.23593-94, 3855-912, 23933-37.

*Second*, in addition to legislators' depositions, Appellants also participated in the deposition of Adam Kincaid, who testified both individually and as the corporate representative of the National Republican Redistricting Trust. ROA.23938. In a separate order on appeal, which was consolidated with the first, the district court rejected their request to unseal privileged portions of his deposition. *See* ROA.71596-99; LULAC.Br.10-11. Although Appellants now dismiss Kincaid as merely "the Texas Republican congressional delegation's lobbyist," *see* LULAC.Br.9-11, they do

not seem to dispute the characterization of the U.S. District Court for the District of Columbia that Kincaid and the Trust "consulted with Texas officials during the 2021 congressional redistricting process," *see In re Kincaid*, No. 22-mc-67, 2023 WL 6459801, at *1 (D.D.C. Oct. 4, 2023) (mem. op.), or that Appellants were allowed to depose Kincaid in the first place because the evidence they sought "focus[ed] on the development, creation and purpose of Texas's redistricting boundaries," *id.* at *3.

At that deposition Kincaid's own counsel represented him, but counsel for certain Legislators also appeared to represent the interests of their clients. ROA.23938. During that deposition, counsel for the Legislators lodged certain objections raising legislative privilege but permitted Kincaid to answer. ROA.23938; *see also* ROA.7511-12. This was consistent with the procedure that the three-judge panel had announced with respect to other witnesses in possession of information that was potentially subject to the legislative privilege. ROA.7511-12.

As in its earlier December 2023 order, the panel rejected Appellants' argument that the Legislators waived the privilege by involving third parties in the legislative process. ROA.71597. The panel, referring to its earlier order, reiterated instead that "the privilege has been waived where privilege[d] material has been made publicly available to third parties not brought into the legislative process." ROA.71597.

## Summary of the Argument

**I.**   This Court lacks appellate jurisdiction over this interlocutory order for two separate reasons. *First*, the notice of appeal as to the district court's December 2023 order was not filed within the requisite 30 days. And, *second*, this Court held in *Hughes* and *Bettencourt* that a ruling vitiating a privilege held by a non-party falls

within the scope of the collateral-order doctrine. But Appellants *are* parties, and the trial court *refused* to vitiate the privilege. As a result, their complaints are far from "effectively unreviewable" after final judgment. *See Leonard v. Martin*, 38 F.4th 481, 486 (5th Cir. 2022). After all, if that denial turned out to be erroneous *and* prejudicial, then the only harm would be that the parties would have to retry the case. *See Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100, 109 (2009).

**II.**   Even if this Court has jurisdiction to reach the merits of this appeal, Appellants' challenges to the scope of the privilege are without merit. As this Court has now unequivocally held, the privilege protects actions that occur "within 'the regular course of the legislative process.'" *Hughes*, 68 F.4th at 235 (quoting *United States v. Helstoski*, 442 U.S. 477, 489 (1979)). Contrary to Appellants' assertions, it applies not just to communications between legislators and their staff but also to "material prepared for a legislator's understanding of legislation," *Bettencourt*, 93 F.4th at 322 (quoting *Hughes*, 68 F.4th at 235-36), and to "material provided by or to third parties involved in the legislative process," *id.* at 318. Because "the only purpose of [Appellants'] subpoenas was to further [their] inquiry into the lawmakers' motivations," *Hubbard*, 803 F.3d at 1311, it falls within the heartland of the privilege as defined by this Court (and the Supreme Court before it), *Hughes*, 68 F.4th at 238 (quoting *Tenney*, 341 U.S. at 377).

**III.**   This Court has also held that legislators do not "waive the legislative privilege when they communicate[] with parties outside the legislature, such as party leaders and lobbyists"—only when they generally disseminate information to the public. *Id.* at 236-37. That rule is now the law of the Circuit. And even if it were not,

it would flow directly from the Supreme Court's ruling that only an "explicit and unequivocal renunciation" of the privilege constitutes waiver in this context. *See Helstoski*, 442 U.S. at 491. As this Court recognized in *Hughes* and *Bettencourt*, the modern legislative process requires the input of persons and entities outside the legislature itself. Bringing such individuals into the conversation does not unequivocally waive the very privilege that protects that process.

**IV.** Finally, the district court correctly applied *Hughes* to reject the multi-factor balancing test proposed by Appellants. True, the privilege may yield to important federal interests in "extraordinary instances," but those instances are defined categorically—not on a document-by-document basis. *Hughes*, 68 F.4th at 237-38 (quoting *United States v. Gillock*, 445 U.S. 360, 373 (1980)). *Hughes* and *Bettencourt* found that other voting-rights challenges were not such categories. Appellants raise no argument demonstrating that redistricting litigation is materially different in this regard.

## Standard of Review

Federal Rule of Civil Procedure 37(a) authorizes a party to "move for an order compelling disclosure or discovery," which under well-established rules is limited to "nonprivileged matter[s] that [are] relevant to any party's claim or defense." Fed. R. Civ. P. 26(b)(1). The Court reviews a district court's ruling on such a discovery motion for an abuse of discretion. *Whole Woman's Health v. Smith*, 896 F.3d 362, 369 (5th Cir. 2018) (citing *Wiwa v. Royal Dutch Petrol. Co.*, 392 F.3d 812, 817 (5th Cir. 2004)). "The district court's legal conclusions should be reviewed *de novo*, and its

factual findings should not be disturbed unless they are clearly erroneous." *Id.* (quoting *Marceaux v. Lafayette City-Par. Consol. Gov't*, 731 F.3d 488, 491 (5th Cir. 2013)).

**A R G U M E N T**

## I. This Court Lacks Jurisdiction to Consider Appellants' Discovery Dispute.

To start, although Appellees agree that the issues in this appeal should be promptly resolved—to the extent they have not already been—the Texas Supreme Court has recently reiterated that, under Texas law, the "duty of candor to the court and the duties of officers of the court" obliges Texas lawyers to "identify even arguable jurisdictional obstacles." *In re Dallas County*, 697 S.W.3d 142, 153 (Tex. 2024) (orig. proceeding). In compliance with that duty, Appellees raise two issues that likely prevent this Court from ever reaching the merits of this case: an untimely notice of appeal and a lack of appellate jurisdiction under the collateral-order doctrine.

### A. Appellants did not file a timely notice of appeal regarding the district court's December 2023 order.

At the outset, this Court lacks appellate jurisdiction over Appellants' challenge to the district court's December 2023 order—which covers most of the materials at issue—because their notice of appeal was untimely. Appellants filed their notice of appeal 60 days after the district court's order at issue. *Compare* ROA.23957, *with* ROA.23578. In doing so, they appear to rely on Rule 4(a)(1)(B), which allows 60 days to appeal if the United States is a party. However, the United States did not appeal and is not a party to Appellants' complaint. *See Hall v. Hall*, 584 U.S. 59, 71-72 (2018) (explaining that separate cases remain distinct even when they are

15

consolidated). As a result, Appellants had only 30 days to appeal. *See* 16A Charles Alen Wright et al., Fed. Prac. & Proc. § 3950.2 (5th ed. 2024). Since they missed that deadline by a month, their appeal over the district court's December 2023 order must be dismissed for lack of jurisdiction. This appeal is thus entirely limited to Appellants' demands to certain portions of the deposition of Kincaid. *See* ROA.71596-98.

### B.  This appeal falls outside the class of cases over which this Court has exercised collateral-order jurisdiction.

Even if the appeal were timely, Appellants are wrong that this Court has jurisdiction under the collateral-order doctrine because *Bettencourt* held that "orders of the district court denying discovery are appealable as collateral orders." LU-LAC.Br.1. Because this case falls outside the narrow exception that *Bettencourt* recognized (like *Hughes* and *Harkins* before it), Appellants could have obtained review here only on a writ of mandamus—which they conspicuously failed to seek and which would have been unavailable in any case.

**1.**    The collateral-order doctrine is a judicially recognized gloss on 28 U.S.C. § 1291, which vests this Court with jurisdiction over "final decisions of the district courts." As the Supreme Court has held, "a final decision is typically one by which a district court disassociates itself from a case." *Mohawk*, 558 U.S. at 106 (cleaned up). But it has also "long given § 1291 a practical rather than a technical construction." *Leonard*, 38 F.4th at 486 (cleaned up). Under that view, certain "collateral rulings" are deemed final and thus "immediately appealable" to the extent that they "(1) conclusively determine the disputed question, (2) resolve an important issue

completely separate from the merits of the action, and (3) [would] be effectively un-reviewable on appeal from a final judgment." *Id.* (quoting *Vantage Health Plan, Inc. v. Willis-Knighton Med. Ctr.*, 913 F.3d 443, 448 (5th Cir. 2019)). The first two elements of the collateral-order test are met here, but the third is entirely absent.

As for the *first*, the panel's ruling was conclusive but only as to *third-party subpoena recipients* who are Appellees here. This appeal is thus unlike *Hughes* and *Bettencourt* because "failure to comply" with the district court's order will not "result in sanctions against" *Appellants*, the plaintiffs that brought this suit. *Hughes*, 68 F.4th at 233 (quoting *Smith*, 896 F.3d at 367). That said, the order purports to resolve the appealed discovery issues, which were heavily litigated, receiving multiple rounds of briefing. *E.g.*, ROA.22474-75, 23190. It is not a case where the appealed order fails to "conclusively determine whether, and to what extent, discovery might be required." *Banca Pueyo SA v. Lone Star Fund IX (U.S.), L.P.*, 978 F.3d 968, 973 (5th Cir. 2020). Nevertheless, although a district court can always revisit its interlocutory orders, *see Harmon v. Dallas County*, 927 F.3d 884, 892 n.14 (5th Cir. 2019) (per curiam), there is no indication here that the district court intends to do so, *see* ROA.23593-95. As a result, the order could be interpreted as conclusively determining the discovery dispute.

With respect to the *second* element, this case, like this Court's recent cases addressing the applicability of the legislative privilege, presents an "important question[] separate from the merits" of the underlying litigation. *See Smith*, 896 F.3d at 367. "Here, the underlying *merits* issue is whether [Texas's redistricting plans] violate[] federal law, while the issue in *this appeal* is whether the legislators can claim

privilege" over approximately 1,200 pages of documents and portions of 26 deposition transcripts that plaintiffs insist are vital to its case. *Hughes*, 68 F.4th at 235.

But the *third* element—whether "the consequence of forced discovery here is 'effectively unreviewable' on appeal from the final judgment"—is entirely absent for two reasons. *Smith*, 896 F.3d at 367. To start, an order *denying* a motion to compel the disclosure of privileged information is different in kind from one *granting* such a motion, over the arguments of third-party subpoena recipients, when it comes to the effectiveness of post-trial review. After all, a third-party subpoena recipient's assertion of privilege is "an asserted right the legal and practical value of which would be destroyed if it were not vindicated before trial." *Leonard*, 38 F.4th at 486 (citation omitted). That is because if information is wrongly disclosed, no appellate remedy can "retract privileged information that has been shared into the public domain." *Hughes*, 68 F.4th at 233. By contrast where, as here, the trial court *denies* the disclosure of information based on privilege, there is nothing to retract: The only harm is that the parties may have to retry the case should the ruling be both erroneous and prejudicial. *See Goddard v. United States*, 131 F.2d 220, 221 (5th Cir. 1942); *Siler v. Env't Prot. Agency*, 908 F.3d 1291, 1298 (Fed. Cir. 2018).

Moreover, as the Supreme Court recognized in *Mohawk*, the nature of the privilege and the identity of the party claiming it are also relevant to the effectiveness of a post-trial appeal. 558 U.S. at 113 n.4. Specifically, the Court held that when a *party* is involved, a court can "remedy the improper disclosure of privileged material in the same way [it can] remedy a host of other erroneous evidentiary rulings: by vacating an adverse judgment and remanding for a new trial in which the protected

material and its fruits are excluded from evidence." *Id.* at 109. Although the Court recognized that it "is undoubtedly correct that an order to disclose privileged information intrudes on the confidentiality of" privileged communications and could have *some* effect on "*ex ante* incentives," *id.*, it concluded that risk is justified given the significant cost of piecemeal discovery appeals when compared to the limited benefit of allowing review of whether the "law will be misapplied," *id.* at 110.

Since *Mohawk*, this Court has repeatedly emphasized the relevance of party status in determining the availability of collateral-order review. *Hughes* found third-party legislators can take an interlocutory appeal of adverse legislative-privilege rulings affecting them because seeking a new trial was (1) ineffective, since "a new trial cannot retract" materials from "the public domain" and (2) entirely unavailable to third parties who "cannot move for a new trial." 68 F.4th at 233; *see also Smith*, 896 F.3d at 367-68. *Bettencourt* subsequently reaffirmed that the "class" of orders that *Hughes* identified was "orders denying non-party state legislators' assertions of legislative privilege," *Bettencourt*, 93 F.4th at 319—not, as Appellants suggest, "orders of the district court denying discovery," *see* LULAC.Br.1. Because no such order is present here, neither is appellate jurisdiction under the collateral-order doctrine.

**2.**    Although this Court "has discretion to treat [this] mere appeal as [a] petition for writ of mandamus," it should decline to do so. *See S. Pac. Transp. Co. v. San Antonio ex rel. City Pub. Serv. Bd.*, 748 F.2d 266, 270 (5th Cir. 1984). The scope of this Court's jurisdiction to hear a collateral-order appeal regarding legislative privilege is not a surprise to Appellants. Due to the objections of some of the same parties who represent Appellants in this case, jurisdiction was a key focus in the briefing in

*Bettencourt*[6]—not to mention *Hughes*.[7] *Bettencourt* and *Hughes*'s resolution of the jurisdictional question—including its limitation to non-parties—is therefore binding law of the circuit unless and until revisited by the en banc Court or the Supreme Court. *E.g.*, *Stokes v. Sw. Airlines*, 887 F.3d 199, 204-05 (5th Cir. 2018). Parties who actively participated in litigating that rule should not be heard to complain about its strictures or excused from complying with the ordinary rules of appellate procedure.

## II.    The Legislative Privilege Protects All Materials Within the Legislative Process.

If this Court determines that it has jurisdiction to consider the merits of the appeal, it should hold that the three-judge panel correctly applied well-established law to the specific documents and testimony in front of it. Informed by the vital purpose the legislative privilege serves, the Supreme Court has long instructed courts to read the privilege "broadly," *United States v. Johnson*, 383 U.S. 169, 179 (1966), to shield from inquiry "legislative acts" as well as "the motivation for those acts," *United States v. Brewster*, 408 U.S. 501, 512 (1972). As the Supreme Court has explained, "legislative acts" include anything "generally done in a session of the House by one of its members in relation to the business before it." *Id.* at 509 (quoting *Kilbourn v.*

---

[6] *See, e.g.*, Appellants' Opening Brief at 23-29, *Bettencourt*, 93 F.4th 310 (No. 23-50201), ECF No. 68; Brief for Plaintiffs-Appellees at 19-39, *Bettencourt*, 93 F.4th 310 (No. 23-50201), ECF No. 74.

[7] *See* Brief of the LULAC Plaintiffs as Appellees at 15-23, *Hughes*, 68 F.4th 228 (No. 22-50435), ECF No. 48; Appellants' Reply Brief at 2-9, *Hughes*, 68 F.4th 228 (No. 22-50435), ECF No. 54; *accord* Oral Argument Recording at 0:55-3:00, *Hughes*, 68 F.4th 228 (No. 22-50435).

*Thompson*, 103 U.S. 168, 204 (1880)). Appellants' efforts to narrow the application of this important governmental privilege by custodian, topic, and time period are each inconsistent with caselaw from this Court, its sister circuits, or both.

## A. For centuries, the privilege has safeguarded legislative independence.

The legislative privilege shields from inquiry acts of legislators and their agents undertaken when "acting in the sphere of legitimate legislative activity." *Tenney*, 341 U.S. at 376. The privilege both "protects 'against inquiry into acts that occur in the regular course of the legislative process and into the motivation for those acts'" and "precludes any showing of how [a legislator] acted, voted, or decided." *Helstoski*, 442 U.S. at 489 (alteration in original) (quoting *Brewster*, 408 U.S. at 525). Because "[t]he privilege protects the legislative process itself," *Hubbard*, 803 F.3d at 1308, it covers not only "words spoken in debate," but also "[c]ommittee reports, resolutions, and the act of voting" as well as other "things generally done" during a legislature's session "by one of its members," *Gravel*, 408 U.S. at 617. When it applies, a legislator "may not be made to answer—either in terms of questions or in terms of defending himself from prosecution." *Id.* at 616.

The common-law roots of the legislative privilege run deep, stretching back to the English "Parliamentary struggles of the Sixteenth and Seventeenth Centuries." *Tenney*, 341 U.S. at 372. But "[s]ince the Glorious Revolution in Britain"—which itself followed a not-so-glorious civil war culminating in judicially sanctioned regicide—"the privilege has been recognized as an important protection of the independence and integrity of the legislature." *Brewster*, 408 U.S. at 508.

Haunted by the "ghost of Charles I," Englishmen took "[f]reedom of speech and action in the legislature . . . as a matter of course." *Tenney*, 341 U.S. at 372. Their colonial neighbors went further, building that protection into the Speech or Debate Clause of the U.S. Constitution, U.S. Const. art. I, § 6, as well as analogous clauses in many of the earliest state constitutions, *Tenney*, 341 U.S. at 375-77. Moreover, though the "Federal Speech or Debate Clause . . . by its terms is confined to federal legislators," *Gillock*, 445 U.S at 374, the Supreme Court "generally ha[s] equated" the scope of the privilege afforded to federal legislators via the Constitution and the privilege afforded to state legislators via the common law, *see Sup. Ct. of Va. v. Consumers Union of U.S., Inc.*, 446 U.S. 719, 733 (1980); *see also Jefferson Cmty.*, 849 F.3d at 624. For good reason. The federal-common-law legislative-privilege "is similar in origin and rationale" to its constitutional counterpart, *Sup. Ct. of Va.*, 446 U.S. at 732, and inevitably concerns of "federalism and comity . . . are at stake when a federal court orders state lawmakers to produce documents" or testimony, *Hughes*, 68 F.4th at 234.

## B. Appellants seek material that falls within the scope of that privilege.

There can be little question that the subpoenaed documents and testimony fall squarely within the scope of the legislative privilege as defined by *Hughes* and reaffirmed by *Bettencourt*. Specifically, the Supreme Court has recognized that the legislative privilege protects legislators when they act "in the sphere of legitimate legislative activity." *Tenney*, 341 U.S. at 376. And it serves to prevent "judicial inquiries into legislative or executive motivation" for their official acts, which "represent a

substantial intrusion into the working" of those branches. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 268 n.18 (1977). Even in "some extraordinary instances [in which] members might be called to . . . testify concerning the purpose of the official action . . . such testimony frequently will be barred by privilege." *Id.* at 268. That is why this Court and its sister circuits uniformly hold that such inquiries "strike[] at the heart of the legislative privilege" and are therefore protected from discovery in private civil litigation. *See Hubbard*, 803 F.3d at 1310; *see also Pernell*, 84 F.4th at 1343; *N.D. Legis. Assembly*, 70 F.4th at 463-64; *Hughes*, 68 F.4th at 235-36; *Alviti*, 14 F.4th at 87; *Lee*, 908 F.3d at 1187-88.

Because even serving as a part-time legislator can be a full-time job, the sphere this privilege protects is "necessarily broad." *Bettencourt*, 93 F.4th at 322 (quoting *Hughes*, 68 F.4th at 236). As a result, "[s]tate lawmakers can invoke legislative privilege to protect actions that occurred within 'the sphere of legitimate legislative activity' or within 'the regular course of the legislative process.'" *Hughes*, 68 F.4th at 235 (first quoting *Tenney*, 341 U.S. at 376; and then quoting *Helstoski*, 442 U.S. at 489). This is not without limits. For example, *political acts* "however appropriate" do not receive "the protection afforded by the Speech or Debate Clause"—or its common-law analog. *Brewster*, 408 U.S. at 512. At the same time, legislative acts are "not limited to the casting of a vote on a resolution or bill; [the privilege] covers all aspects of the legislative process." *Hughes*, 68 F.4th at 235-36; *see also, e.g.*, *Alviti*, 14 F.4th at 87 (citing *Gillock*, 445 U.S. at 372). In essence, because "[t]he privilege protects the legislative process itself," it "covers . . . legislators' actions in the proposal, formulation, and passage of legislation." *Hubbard*, 803 F.3d at 1308. But the

privilege does not "include a wide range of legitimate 'errands' performed for constituents, the making of appointments with Government agencies, assistance in securing Government contracts, preparing so-called 'newsletters' to constituents, news releases, and speeches delivered outside" the Legislature. *Brewster*, 408 U.S. at 512.

There can be no dispute that the discovery at issue falls within the general scope of the legislative privilege. Because "[n]o act is more fundamentally legislative than lawmaking itself," the act of "redistricting is clearly a legislative function," *In re Perry*, 60 S.W.3d 857, 860 (Tex. 2001) (orig. proceeding) (citing *Citizens for Good Gov't v. City of Quitman*, 148 F.3d 472, 475 (5th Cir. 1998)), to which the legislative privilege applies, *Lee*, 908 F.3d at 1188; *see also* U.S. Const. art. I, § 4, cl. 1 (reserving the regulation of elections primarily to state Legislatures). Appellants admit (*e.g.*, at 14, 21-22, 36-38)—indeed tout—that they seek the requested information to examine the subjective motivations of individual legislators when they undertook the task of redistricting. Appellants *must* concede this; there would be no other reason that Appellants demand evidence about, for example, discussions between individual members and the House General Counsel or House Parliamentarian. *See* ROA.9350, 9354. Although such individuals undoubtedly discuss any range of topics, the three-judge panel correctly noted that "the only purpose of [such] subpoenas was to further [the] inquiry into the lawmakers' motivations." ROA.23584 (second alteration in original) (quoting *Hubbard*, 803 F.3d at 1311). Any other such discussions would be "irrelevant" to Appellants' claims. *Hubbard*, 803 F.3d at 1311. Absent an

exception or waiver, such an inquiry falls squarely within the heartland of the legislative privilege. *E.g.*, *Hughes*, 68 F.4th at 228 (citation omitted).

## C. None of the four ways that Appellants try to limit the scope of the privilege can be squared with precedent.

Notwithstanding this Court's unequivocal statements in *Hughes* and *Bettencourt* regarding the breadth of the privilege, Appellants insist that the privilege protects neither purely factual materials, nor documents not shown to a legislator, nor documents held by a third-party custodian, nor documents and testimony about information that "either preceded the release of the Census redistricting data . . . or followed enactment of the challenged redistricting plans." LULAC.Br.-31-32. Appellants are wrong on all counts.

### 1. The privilege extends to factual materials.

In perhaps their only argument not squarely foreclosed by *this* Court's precedent, Appellants ask this Court to distinguish purely factual matters from what they vaguely describe as "integral part[s] of the deliberative and communicative process." LULAC.Br.29-30. The Court should decline the invitation for four reasons.

*First*, the argument would create a dichotomy where none exists. Appellants' assertion that purely factual materials do not "reflect a legislator's opinions or motives," *see* LULAC.Br.29, misses the point. The legislative privilege broadly protects the entire "sphere of legitimate legislative activity" and activities that occur "within 'the regular course of the legislative process.'" *Hughes*, 68 F.4th at 235. And it is "not consonant with our scheme of government for a court to inquire into motives of legislators" or to "facilitate an expedition seeking to uncover a legislator's

subjective intent in drafting, supporting, or opposing proposed or enacted legislation." *Id.* at 238.

As the panel noted, "disclosing *that* the legislator relied on or considered some facts, and not others, would inevitably indicate the legislator's deliberations." ROA.23581. The Supreme Court has recognized that the privilege projects legislators from "the hazard of a judgment against them based upon a jury's speculation as to motives." *Tenney*, 341 U.S. at 377. And the Court has recognized that revealing evidence of an official's reliance "on facts relating to a particular individual" can reveal the official's "subjective intent." *Bogan v. Scott-Harris*, 523 U.S. 44, 54 (1998); *see also Gov't of Virgin Islands v. Lee*, 775 F.2d 514, 521 (3d Cir. 1985) ("[F]act-finding, information gathering, and investigative activities are essential prerequisites to the drafting of bills and the enlightened debate over proposed legislation."). So too here: Disclosing that materials containing particular facts are in a legislator's possession or were prepared for her understanding would demonstrate that legislator's subjective intent or motivation. *See, e.g.*, *Helstoski*, 442 U.S. at 487-90. Thus, the materials fall within the scope of the legislative process and, therefore, also the privilege. *See Bettencourt*, 93 F.4th at 322.

*Second*, Appellants' argument appears to be based on a quote from *Gravel* taken out of context. Specifically, *Gravel* observed that "[t]he heart of the Clause is speech or debate" and that "[i]nsofar as the Clause is construed to reach *other matters*, they must be an integral part of the deliberative and communicative *processes* by which Members participate" in legislative matters. *Gravel*, 408 U.S. at 625 (emphasis added). But this statement referred to Senator Gravel's alleged attempt to publish

the Pentagon Papers with a private publishing company, *id.* at 622-27—an act which was "in no way essential to the deliberations of the Senate," *id.* at 625.

This statement does not suggest that a court should assess how "integral" to the "deliberative and communicative processes" a legislator's actions are so long as they stay within the outer boundaries of the "legislative sphere." *See id.* at 624-25. To the contrary, the Court agreed that the Senator's acts of "plac[ing] the entire 47 volumes" of the Pentagon Papers "in the public record" during a committee hearing were privileged even without a demonstrable connection to a particular piece of legislation. *Id.* at 609. And, in drawing this line, *Gravel* was not breaking ground. From the early days of the Republic, it has been understood that "although a speech delivered in the house of [representatives] is privileged," if the same representative "publishes his speech, and it contains libellous matter, he is liable . . . ." 2 Joseph Story, *Commentaries on the Constitution of the United States* § 863 (1833). In short, the legislative privilege does not protect information "publicly released *outside* of the legislative process" but does protect information shared *within* the legislative process. *Bettencourt*, 93 F.4th at 323 (citation omitted).

*Third*, the argument would extend rules regarding the deliberative-process and attorney-client privileges where they do not belong. *Contra* LULAC.Br.30 (asserting that the court should apply the same rules). Unlike exemptions to statutory privileges, the scope of any common-law privilege "[i]s governed by its underlying purpose." *United States v. Johnson*, 702 F. App'x 815, 816 (11th Cir. 2017) (per curiam) (citing *United States v. Tenorio-Angel*, 756 F.2d 1505, 1510 (11th Cir. 1985)). The attorney-client privilege, for example, excludes factual materials because it is designed

27

to encourage attorney-client communications—not to allow clients to hide factual material by providing it to their lawyer. *See, e.g.*, *Adams v. Mem'l Hermann*, 973 F.3d 343, 349 (5th Cir. 2020) (citing *Upjohn Co. v. United States*, 449 U.S. 383, 395-96 (1981)). Conversely, a document reflecting a lawyer's opinion may be covered by the work-product doctrine because the doctrine was designed to protect lawyers' intellectual property. *See Cox v. Adm'r U.S. Steel & Carnegie*, 17 F.3d 1386, 1421-22 (11th Cir. 1994); *Hickman v. Taylor*, 329 U.S. 495, 510-11 (1947). Neither concern applies in the legislative-privilege context because that privilege serves to both ensure "the independence of individual legislators" and "reinforc[e] the separation of powers." *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 502 (1975).

This Court should not extend the distinction between facts and non-facts to the legislative-privilege context. After all, the political branches set the rules by which citizens must conduct their most personal activities. The political branches need facts to do so intelligently—facts which may be available only from other branches of government if not outside the government entirely. *See Virgin Islands*, 775 F.2d at 521. And, as this Court has observed, "[a] court proceeding that probes legislators' subjective intent in the legislative process is a 'deterrent[] to the uninhibited discharge of [this] legislative duty.'" *Hughes*, 68 F.4th at 238 (first alteration in original) (quoting *Tenney*, 341 U.S. at 377). Excluding factual material from the scope of the legislative privilege—or the corollary executive privilege, for that matter—fails to "provide sufficient elbow room for advisors to obtain information from all knowledgeable sources." *In re Sealed Case*, 121 F.3d 729, 752 (D.C. Cir. 1997) (per curiam).

In arguing to the contrary, Appellants offer nothing more than their own ipse dixit that "requiring the disclosure" of purely factual material "in no way frustrates the privilege's purposes . . . ." LULAC.Br.29-30. But to date, courts examining the question have held the opposite: The legislative privilege turns on whether the "factual heart" or core of a plaintiff's claim implicates legislators' "subjective motiv[e]"—not on a "document-by-document" analysis of what does or does not set out a particular legislator's opinions or motivation. *Hubbard*, 803 F.3d at 1310, 1311; *see also Miller v. Transamerican Press, Inc.*, 709 F.2d 524, 530 (9th Cir. 1983) (quoting *Kilbourn*, 103 U.S. at 204); *Bethune-Hill v. Va. State Bd. of Elections*, 114 F. Supp. 3d 323, 338 (E.D. Va. 2015); *Citizens Union of City of N.Y. v. Att'y Gen. of N.Y.*, 269 F. Supp. 3d 124, 158 (S.D.N.Y. 2017).

In *Hubbard*, for example, plaintiffs brought a First Amendment retaliation claim, the "core" or "factual heart" of which implicated legislators' "subjective motivation." 803 F.3d at 1310. The district court allowed plaintiffs to obtain many of the same kinds of documents and testimony sought by the Appellants here. *Compare id.* at 1303 n.4, *with* ROA.23581-82 (describing examples of testimony Appellants sought). The Eleventh Circuit reversed, reasoning that "the factual heart of the retaliation claim and the scope of the legislative privilege were one and the same: the subjective motivations of those acting in a legislative capacity." *Hubbard*, 803 F.3d at 1311. As a result, the subpoenas' "only purpose" was to seek "information about the motives for legislative votes and enactments"—that is, to "prob[e] the subjective motivations of the legislators who supported" certain legislation. *Id.* at 1310. Because here, as in *Hubbard*, the "heart" of Appellants' claim completely overlaps

with the legislative privilege's "scope," Appellants should be barred from obtaining any of the materials they seek. *Id.* at 1311.

*Fourth*, the argument would create a circuit split that does not currently exist. Although Appellants conspicuously fail to mention it, the Eleventh Circuit recently held that the legislative privilege applies to purely factual materials that are sought for the purpose of "uncover[ing] the legislators' motives." *Pernell*, 84 F.4th at 1344; *see id.* at 1343-44 (rejecting the "categorical distinction" based on purportedly "purely factual matter"); *Hubbard*, 803 F.3d at 1311.

### 2. The privilege covers information and communications made part of the legislative process—not specific records.

Unlike Appellants' assertions about factual materials, this Court has already addressed (and rejected) Appellants' argument that the legislative privilege cannot shield materials unless a particular document was shared with legislators. *See* LULAC.Br.27-28. Specifically, *Bettencourt* involved materials such as "talking points," whose contents may have been shared with members of the legislature even if the documents themselves were not. Appellants' Opening Brief, *Bettencourt*, *supra*, at 14. As Judge Smith explained on behalf of this Court in *Bettencourt*, because the modern legislative process involves stakeholders beyond elected legislators, its scope necessarily extends to both "material prepared for a legislator's understanding of legislation" as well as "materials the legislator possesses related to potential legislation." 93 F.4th at 322 (quoting *Hughes*, 68 F.4th at 236). As he later elaborated on behalf of the three-judge panel in *this* case, a legislator need not have seen a particular

*document* to come within the scope of that rule so long as "someone communicate[s] the content to them within the legislative process." ROA.23584.

This aspect of *Bettencourt* is far from unknown in privilege law. For example, if an attorney had prepared talking points for a meeting with a client, there would be little dispute that such notes are privileged even if the client never saw the physical document. *See Upjohn Co.*, 449 U.S. at 383, 398-400 (explaining, in unqualified terms, that an attorney's notes are privileged). *Bettencourt* and the panel below merely applied the same concept to the legislative privilege. *See* 93 F.4th at 322 (citing *Hughes*, 68 F.4th at 236).

To the extent that Appellants complain that the privilege can extend only to legislative aides and not to individuals in other branches of government such as the Lieutenant Governor, *see* LULAC.Br.29, this misstates precedent. *Hughes*, for example, specifically examined whether "communications [with] Office of the Lieutenant Governor (who under Texas law . . . serves as the President of the Senate), the Office of the Attorney General (who under Texas law may advise the State and its officers and must represent them in certain forms of litigation), and the Texas Legislative Council (which under Texas law is a legislative agency that provides a pool of resources for legislators, including legal expertise)" fell within the scope of the legislative privilege. Appellants' Opening Brief at 2, *Hughes*, 68 F.4th 228 (No. 22-50435), ECF No. 39-1. The Court unequivocally stated that they did. *Hughes*, 68 F.4th at 236. And it reiterated that principle in *Bettencourt* stating that "there is no reasoned basis to draw the line" for invoking the privilege on a legislator's behalf "at aides and assistants" as opposed to others involved in the legislative process. 93

F.4th at 321-22. This Court's sister circuits are in accord. *See Alviti*, 14 F.4th at 87 ("[T]he parties agree that the former Governor, though not a member of the state legislature, possessed whatever legislative privilege that the state legislators possessed."); *Hubbard*, 803 F.3d at 1301-02 (upholding claims of legislative privilege by the then-current and former Governor)

To the extent Appellants' vague assertion about legislators being "left out" of these documents is one about whether Appellees adequately *proved* that the contents of the privileged documents *were* part of the legislative process, *see* LU-LAC.Br.27-28, it misstates the orders on appeal and the standard of review. The three-judge panel specifically required that legislators "must provide adequate substantiation that someone communicated the content to them within the legislative process for the privilege to apply." ROA.23584. Whether Appellees provided such substantiation is a question of fact reviewed for clear error. *Cf. United States v. Seale*, 600 F.3d 473, 492 (5th Cir. 2010). Appellants cannot meet that standard and have not tried. For example, although Appellants focus much of this argument about documents created by Chris Hilton, LULAC.Br.29, they nowhere contravene the assertion of the Office of the Attorney General (OAG) that these materials reflect or were used to form his "mental impressions regarding the legal compliance of [proposed plans] to assist in providing legal assistance and advice to Senator Huffman regarding redistricting legislation" and that "[t]his legal advice was used in furtherance of Senator Huffman's legislative duties to formulate, consider, and pass redistricting legislation," *see, e.g.*, ROA.19549.

To require legislators—or the OAG and Lieutenant Governor for that matter—to provide yet further information regarding how a document impacts the legislative process would be inconsistent with the purpose of the privilege itself. *Contra* LU-LAC.Br.29 (asserting that protecting such documents would not further the privilege's purposes). As this Court has explained, the privilege is designed not just to "guard against 'judicial interference' by protecting legislators from courts' seeking to 'inquire into the motives of legislators' and 'uncover a legislator's subjective intent," *Bettencourt*, 93 F.4th at 317 (quoting *Hughes*, 68 F.4th at 238), but also to allow them to "focus on their job rather than on motions practice in court," *Hughes*, 68 F.4th at 237.

Appellants' theory would effectively require legislators to log not just every document that came across their desks but also every document whose contents they may have *discussed* during the legislative process. But the *point* of a bicameral legislature like Texas's is to promote consensus and compromise. *See Dep't of Transp. v. Ass'n of Am. R.Rs.*, 575 U.S. 43, 61 (2015) (Alito, J., concurring) ("[B]icameralism and presentment make lawmaking difficult *by design* . . . ." (alteration in original) (citation omitted)). This requires a legislator or her staff to consult with innumerable people about untold numbers of topics. Requiring those same people to simultaneously record every piece of information—written or oral—that they considered would cause the entire process to grind to a halt.

### 3. The scope of the privilege does not turn on the custodian of specific records.

This Court's precedent also squarely forecloses Appellants' assertion that the applicability of the legislative privilege turns on the identity of the custodian, *see* LU-LAC.Br.31-32, because the privilege *does* "[e]ncompass [i]nformation provided by or to third parties," *contra* LULAC.Br.31. After all, the only custodian at issue in *Bettencourt* was Alan Vera, who before his death had been an active participant in the legislative process on issues such as election integrity but had not been a member of the Legislature. 93 F.4th at 314-15. Building on the Court's earlier ruling in *Hughes*, 68 F.4th at 237, *Bettencourt* unequivocally stated that "[t]he legislative privilege covers material provided by or to third parties involved in the legislative process," 93 F.4th at 318. And *Bettencourt* elaborated that "legislators' communications do not lose their protected character merely because they are stored with a third party." *Id.* at 319. Far from idle statements, these were active points of contention between the *Bettencourt* majority and the dissent. *Cf. id.* at 329 (Graves, J., dissenting) (noting that the "applicability of legislative privilege pertaining to documents and communications shared with third parties" was then at issue before the en banc court). And they are binding on this panel.

Appellants' only response is to construe a footnote in the panel's opinion as finding that (1) the legislative privilege's purpose is to protect legislators from the "vicissitudes of motions practice;" (2) discovering documents from third parties, rather than from legislators, does not impede this purpose; but (3) the privilege nevertheless prevents discovering documents from third parties. LULAC.Br.31.

(quoting ROA.23582-83 n.5). Again, this argument is foreclosed by *Bettencourt*, which stated that "one purpose is to protect legislators from the cost, burden, and inconvenience of trial. But that's not all. Equally important is the privilege's function to guard against . . . 'inquir[y] into the motives of legislators.'" 93 F.4th at 318 (quoting *Hughes*, 68 F.4th at 238). Because Appellants' demand for these documents "is merely an attempt to reveal what the legislator considered," ROA.23582, it falls squarely within the scope of the legislative privilege as recognized by *Bettencourt*, 93 F.4th at 318.

### 4. Courts have never defined the scope of the privilege based on what litigants later define as the relevant "enactment period."

Although Appellees are unaware of any case that phrases the privilege in terms of an "enactment period," Appellants' suggestion that courts should tie the privilege to the discussion of a particular bill, LULAC.Br.31-32, is irreconcilable with how courts have treated the privilege for decades. For example, the very notion of an "enactment period" depends on the premise that a bill was actually passed. *See, e.g.*, *Enact*, Black's Law Dictionary 643 (10th ed. 2014) (defining "enact" as "[t]o make into law by authoritative act; to pass"). But courts, including this one, have long defined the "legislative act" to extend to *anything* "generally done in a session of the House by one of its members in relation to business before it." *Brewster*, 408 U.S. at 509; *see also, e.g.*, *Bettencourt*, 93 F.4th at 322 (quoting *Hughes*, 68 F.4th at 235-36). And the privilege extends to legislative activities that "bear on *potential* legislation" as a part and parcel of the legislative process. *Hughes*, 68 F.4th at 236 (emphasis added) (quoting *Almonte v. City of Long Beach*, 478 F.4th 100, 107 (2d Cir. 2007)).

This process is no less legislative—and thus no less privileged—if it results in the choice *not* to enact a bill. *See Ass'n of Am. R.Rs.*, 575 U.S. at 61 (Alito, J., concurring).

Appellants' assertions to the contrary are wrong for three reasons. *First*, Appellants' chronological limitations make little sense given how the legislative-drafting process works in practice. Bills do not materialize out of thin air. And due to the brevity of a Texas legislative session, the current Legislature will begin drafting bills that it knows the next Legislature will need to consider before the election even occurs. For example, even though the Comptroller will not provide a formal budget estimate until the 89th Legislature enters session, *Biennial Revenue Estimate for Texas*, Tex. Comptroller of Pub. Accts., https://perma.cc/YS9T-5XE9, the Senate Finance Committee of the 88th Legislature began certain preliminary work regarding the budget months ago, *see, e.g.*, *Senate Notice of Public Hearing*, Tex. Legislature Online, https://perma.cc/N9LW-8VF5. Similarly, although the Census Bureau did not publish its data regarding the 2020 census until after the 87th Legislature had adjourned, members of the 86th Legislature and their staff began preliminary discussions more than a year before the beginning of the "enactment period" as defined by Appellants. *See* LULAC.Br.31-32. And members of the 88th Legislature passed the current maps after that artificially defined period ended. *See* LULAC.Br.31-32.

*Second*, Appellants misread *Hughes* when they suggest that this Court has held otherwise. *See* LULAC.Br.32. True, *Hughes* limited the scope of the privilege to the "the sphere of legitimate legislative activity" or within "the regular course of the legislative process." 68 F.4th at 235. But at no point did *Hughes* suggest that the

legislative *process* starts when a particular bill is introduced or ends when it is signed. *See id.* at 235-40.

*Third*, the only prseudo-chronological limitation on the privilege of which Appellees are aware is the Supreme Court's statement in *Helstoski* that "a *promise* to introduce a bill" is not covered by the privilege. 442 U.S. at 490. Even this limitation is, however, less about chronology than about the limitation that the privilege does not apply to *political* acts. *See supra* p. 24. After all, a promise to a constituent or donor is perhaps the quintessential political act. But until the legislator begins the process of formulating an actual bill, it is just that—a "campaign promise[]"—which "by long democratic tradition" is understood to be "the least binding form of human commitment." *Republican Party of Minn. v. White*, 536 U.S. 765, 780 (2002). That does not mean, however, that courts seek to define precisely when that legislator begins that process of formulating a bill. As discussed above, they do not. *See supra* p. 35-36. And Appellants provide no good reason why this Court should be the first to do so.

## III. The Legislative Privilege Has Not Been Waived.

In addition to its quadripartite assault on the scope of the privilege, Appellants assert what appear to be two different reasons the privilege has been waived. As the Supreme Court held in *Helstoski*, however, "waiver can be found only after explicit and unequivocal renunciation of the protection." 442 U.S. at 491. For many of the reasons this Court has already explained elsewhere, neither of the grounds Appellants assert demonstrates such a renunciation. *See Hughes*, 68 F.4th at 236-37.

*First*, Appellants assert that the involvement of third parties not only limits the scope of the privilege but also acts to *waive* any privilege that may have attached. LULAC.Br.32-34. As this Court correctly recognized in *Hughes*, these are functionally the same argument. 68 F.4th at 236 (describing this flavor of waiver as "an indirect attack on the privilege's scope"). And they are both wrong: The "privilege covers 'legislators' actions in the proposal, formulation, and passage of legislation.'" *Id.* (quoting *Hubbard*, 803 F.3d at 1308). An "exception for communications 'outside the legislature' would swallow the rule almost whole, because '[m]eeting with "interest" groups . . . is a part and parcel of the modern legislative procedures through which legislators receive information possibly bearing on the legislation they are to consider.'" *Id.* (quoting *Bruce v. Riddle*, 631 F.2d 272, 280 (4th Cir. 1980)).

True, this principle has its limits, but this Court has already examined what they are, holding that legislators do not "waive the legislative privilege when they communicate[] with parties outside the legislature, such as party leaders and lobbyists"—but only when they generally disseminate information to the public. *Id.* at 236-37. "The very fact that Plaintiffs need discovery to access these documents shows that they have not been shared publicly." *Id.* at 237. Accordingly, the privilege has not been waived.

*Second*, Appellants argue that the legislators or the defendants—it is not clear who—waived the privilege by partially disclosing information in discovery. To reach this rule, Appellants adopt the panel's analogy between the legislative privilege and the attorney-client privilege. ROA.23592-93. In the instance of the attorney-client privilege, "[d]isclosure of any significant portion of a confidential communication

waives the privilege as to the whole." *See* ROA.23592 (quoting *Indus. Clearinghouse, Inc. v. Browning Mfg. Div. of Emerson Elec. Co.*, 953 F.2d 1004, 1007 (5th Cir. 1992)).

Assuming that analogy is even apt, whether a party has disclosed a significant portion of the confidential communication is a question of fact subject to clear-error review. *Lewis v. Crochet*, 105 F.4th 272, 279 (5th Cir. 2024). It is not even clear to what discovery Appellants are referring given that their brief references "the NRRT and Adam Kincaid depositions" but cites deposition testimony by Dr. Matthew A. Barreto and Senator Kel Seliger. *See* LULAC.Br.34. Appellants certainly do not explain how any of this testimony meets the standard for waiver-by-partial-disclosure.

More fundamentally, the analogy is *not* apt. The Supreme Court has unequivocally held that "[t]he ordinary rules for determining the appropriate standard of waiver do not apply in this setting." *Helstoski*, 442 U.S. at 490-91. As a result, "testifying before the grand juries and voluntarily producing documentary evidence of legislative acts" does not waive the legislative privilege even if they would waive the attorney-client privilege. *Id.* at 490. If that is so, it is hard to see how the legislators here have waived the privilege when any disclosure was far from voluntary. To the contrary, Appellants fought the disclosure of documents in this Court and subpoenas to sit for depositions all the way to the Supreme Court. *See Guillen v. LULAC*, 142 S. Ct. 2773, 2773 (2022) (denying application for stay). If *voluntary* disclosure does not waive the legislative privilege, then complying with a court order certainly does not do so. *Cf. In re Pac. Pictures Corp.*, 679 F.3d 1121, 1130 (9th Cir. 2012) (implying that producing subpoenaed documents after asserting a privilege and thereafter

being threatened with contempt for failing to produce the documents is an *involuntary* disclosure for purposes of the attorney-client privilege).

## IV. The Legislative Privilege Does Not Yield to Claims of Discriminatory Redistricting.

Finally, Appellants are wrong that because this Court once described the legislative privilege as "qualified," *Jefferson Cmty.*, 849 F.3d at 624, the privilege effectively does not apply in redistricting cases, *contra* LULAC.Br.12, 23-24, 26-27. To the contrary, this argument too was raised in *Hughes*, and it was unequivocally rejected because, "like other privileges, the legislative privilege is 'qualified' by *exceptions* that serve 'the normally predominant principle of utilizing all rational means for ascertaining the truth.'" 68 F.4th at 236 (emphasis added) (quoting *Jefferson Cmty.*, 849 F.3d at 624). "[T]he privilege does not *yield*," *Hughes* explained, based on the amorphous multi-factor balancing test adopted by a single district court in *Pataki* and followed with little independent reasoning by other district courts across the country. *Id.* at 235. Instead, the Supreme Court has "drawn the line" of what constitutes "extraordinary instances" at "civil actions." *Id.* at 237-38 (quoting *Gillock*, 445 U.S. at 373). This is true "[e]ven for allegations involving racial animus or retaliation for the exercise of First Amendment rights." *Id.* at 238; *accord Arlington Heights*, 429 U.S. at 268. And as this Court has said, that line holds even for a challenge against "a racially-gerrymandered electoral map" or alleged violations of § 2 of the VRA. *Bettencourt*, 93 F.4th at 325. For the following reasons, there is no reason to revisit that line in this appeal.

**1.**    To start, this Court is always "chary" to create a circuit split, *Flores v. Garland*, 72 F.4th 85, 88 (5th Cir. 2023) (citation omitted), and the only other circuits of which Appellees are aware to have considered the question have rejected the notion that redistricting cases are "within the subset of 'extraordinary instances' that might justify an exception to the privilege," *Lee*, 908 F.3d at 1188 (quoting *Arlington Heights*, 429 U.S. at 268); *see also N.D. Legis. Assembly*, 70 F.4th at 462, 465; *Fla. Common Cause v. Byrd*, 674 F. Supp. 3d 1097, 1104 (N.D. Fla. 2023) (three-judge court); *accord Pernell*, 84 F.4th at 1341-44 (concluding privilege was "insurmountable" in § 1983 cases, even those alleging "racially discriminatory purpose").

The two out-of-circuit district-court decisions that Appellants cite, *see* LULAC.Br.34-36, do not establish that this case is any more an "'extraordinary instance[]' in which the legislative privilege must 'yield[]'" than was *Hughes*, 68 F.4th at 237. Those cases wrongly concluded that redistricting is exempt from the ordinary scope of the legislative privilege simply because it implicates legislative self-interest. *Marylanders for Fair Representation, Inc. v. Schaefer*, 144 F.R.D. 292, 304 (D. Md. 1992); *Bethune-Hill*, 114 F. Supp. 3d at 337. True, the Supreme Court has explained that the purpose of the privilege is not "simply for the personal or private benefit of Members of Congress, but to protect the integrity of the legislative process." *Brewster*, 408 U.S. at 507. But the Court has also said that "[t]he claim of an unworthy purpose does not destroy the privilege." *Tenney*, 341 U.S. at 377; *see also Hughes*, 68 F.4th at 238 (same). It is far from clear that the type of self-interest to which Appellants point—the zealous efforts of elected officials to defend their own prerogatives—*is* an improper purpose given that it is baked into the very notion of checks

and balances upon which our Constitution is premised. *See, e.g.*, *The Federalist* No. 51, at 320 (James Madison) (Clinton Rossiter ed., 1961) ("[The government's] several constituent parts [should], by their mutual relations, be the means of keeping each other in their proper places."); *see also N. Pipeline Const. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 60 (1982) (explaining that the judiciary should "jealously guard" its independence from the other branches).

Beyond these cases, the only authority Appellants can muster is a book, the quoted portion of which mentions nothing about privilege, *see* John Hart Ely, *Democracy and Distrust: A Theory of Judicial Review* 103, 117 (1980), and a student note that candidly acknowledges that the "Supreme Court has never engaged in this balancing analysis in the redistricting context, making it a particularly unmoored exercise," Christopher Asta, Note, *Developing a Speech or Debate Clause Framework for Redistricting Litigation*, 89 N.Y.U. L. Rev. 238, 262 (2014). Neither source can be said to justify departing from this Court's prior decisions as well as from *Lee* and *North Dakota Legislative Assembly*.

**2.** Nor can Appellants evade this decision by invoking the rule of orderliness. *Hughes* already considered whether *Jefferson Community* addressed the issue at hand and concluded that it did not. As this Court explained in *Hughes*, *Jefferson Community* "held only that a claim for injunctive relief could proceed" and "provides no support for the idea that state legislators can be compelled to produce documents concerning the legislative process and a legislator's subjective thoughts and motives." *Hughes*, 68 F.4th at 240. That conclusion regarding how to interpret prior

case law is itself now subject to this Court's strict rule of orderliness. *See Newman v. Plains All Am. Pipeline, L.P.*, 23 F.4th 393, 400 (5th Cir. 2022).

**3.**    And Appellants certainly cannot object, *see* LULAC.Br.38, to the test that the panel used in holding that the privilege did not yield to the *United States*'s claims. The United States is not an appellant here. It is settled law that "a party generally may not appeal a district court's order to champion the rights of another," and Appellants point to no exception that would allow them to do so here. *See Rohm & Hass Tex., Inc. v. Ortiz Bros. Insulation, Inc.*, 32 F.3d 205, 208 (5th Cir. 1994). That objection fails on the merits, moreover, for any one of the following three reasons.[8]

*First*, the panel considered the requirement that "[t]here must be important federal interests at stake beyond a mere constitutional or statutory claim involving racial animus." ROA.23589. Appellants argue that this requirement is incorrect because it "carv[es] out race discrimination cases from important federal interests." LULAC.Br.38. Not so. Preventing racial discrimination is certainly *an* important federal interest, *see Lee*, 908 F.3d at 1188, but the Supreme Court held that, standing alone, it is not a *sufficient* interest to overcome the privilege, *Arlington Heights*, 429 U.S. at 268; *see also Pernell*, 94 F.4th at 1341-43.

---

[8] Because the United States chose *not* to appeal this ruling, their brief is due on the same schedule as Appellees' brief. It is thus unclear the extent to which it agrees with LULAC's objections—or intends to raise any of its own. Appellees reserve the right to seek leave to respond to any additional points that the United States chooses to raise.

*Second*, Appellants complain that "the district court erroneously elevated federal criminal prosecutions over civil enforcement of statutory and constitutional civil rights." LULAC.Br.38. But the panel's statement that "the suit must be more like a federal criminal prosecution than a private plaintiff seeking to enforce his own rights" is drawn specifically from this Court's precedent. ROA.23589. Just last year, this Court described the circumstances in which the privilege could yield as a "continuum" between § 1983 cases (to which the privilege does not yield) and criminal cases (to which the privilege sometimes does yield). *See Hughes*, 68 F.4th at 239. That ruling, which was a major focus of the litigation in *Hughes*—unlike the offhand reference to the "qualified" nature of the privilege in *Jefferson Community*—is binding on the district court and this panel under the rule of orderliness. *See United States v. Segura*, 747 F.3d 323, 328 (5th Cir. 2014).

*Third*, although less than clear, Appellants appear to object to the panel's conclusion that this is "the type of suit brought so easily that it would effectively destroy the privilege" because it can only be brought once every ten years and requires significant resources to litigate. *See* LULAC.Br.38. Appellants' argument fails to explain how *their* redistricting suit is any different in this regard from *Lee*, which the Ninth Circuit found *not* to be extraordinary in the relevant sense, 908 F.3d at 1188; from *North Dakota Legislative Assembly*, which the Eighth Circuit similarly did not find extraordinary, 70 F.4th at 464; or from the discussion of racial gerrymandering and § 2 claims in *Bettencourt*, which this Court observed would not be extraordinary, 93 F.4th at 325; *accord Pernell*, 94 F.4th at 1343. More fundamentally, it ignores that the "extraordinariness" of a case is determined by the *substance* of the claim—not

the resources needed to effectively *prosecute* that claim. *See Hughes*, 68 F.4th at 238-39.

*In re Landry*'s description of redistricting litigation as "not ordinary litigation," 83 F.4th 300, 307 (5th Cir. 2023), is not to the contrary. *Contra* LULAC.Br.38. That statement referenced the reason that the Court decided to take the unusual step of "interven[ing] in a remedial proceeding" that had departed from standards set by the Supreme Court. *Landry*, 83 F.4th at 307. The word "privilege" is not even mentioned in the opinion. Thus, like *Jefferson Community* before it, it provides absolutely no guidance on the relevant question—let alone reason to depart from this Court's decisions in *Hughes* and *Bettencourt*.

## Conclusion

The Court should affirm the panel's order.

Respectfully submitted.

/s/ Frank H. Chang

Frank H. Chang
Taylor A.R. Meehan
Consovoy McCarthy PLLC
1600 Wilson Blvd., Suite 700
Arlington, VA 22209
Tel: (703) 243-9423
taylor@consovoymccarthy.com
frank@consovoymccarthy.com

Patrick N. Strawbridge
Consovoy McCarthy PLLC
Ten Post Office Square
8th Floor South PMB #706
Boston, MA 02109
Tel: (703) 243-9423
patrick@consovoymccarthy.com

*Counsel for House Third-Party Respondents-Appellees*

Ken Paxton
Attorney General of Texas

Brent Webster
First Assistant Attorney General

Aaron L. Nielson
Solicitor General

/s/ Lanora C. Pettit

Lanora C. Pettit
Principal Deputy Solicitor General
Lanora.Pettit@oag.texas.gov

William F. Cole
Deputy Solicitor General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

*Counsel for Defendants-Appellees*

## CERTIFICATE OF SERVICE

On November 27, 2024, this brief was served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court. Counsel further certifies that: (1) any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13; (2) the electronic submission is an exact copy of the paper document in compliance with Fifth Circuit Rule 25.2.1; and (3) the document has been scanned with the most recent version of Symantec Endpoint Protection and is free of viruses.

/s/ Lanora C. Pettit
LANORA C. PETTIT

## CERTIFICATE OF COMPLIANCE

This brief complies with: (1) the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,217 words, excluding the parts of the brief exempted by Rule 32(f); and (2) the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Equity) using Microsoft Word (the same program used to calculate the word count).

/s/ Lanora C. Pettit
LANORA C. PETTIT