————————

Case No. 24-50128

————————

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

————————

————————

No. 24-50128
Consolidated with
No. 24-50449

————————

LEAGUE OF UNITED LATIN AMERICAN CITIZENS; SOUTHWEST VOTER REGISTRATION EDUCATION PROJECT; MI FAMILIA VOTA; AMERICAN GI FORUM OF TEXAS; LA UNION DEL PUEBLO ENTERO; MEXICAN AMERICAN BAR ASSOCIATION OF TEXAS; TEXAS HISPANICS ORGANIZED FOR POLITICAL EDUCATION; WILLIAM C. VELASQUEZ INSTITUTE; FIEL HOUSTON, INCORPORATED; TEXAS ASSOCIATION OF LATINO ADMINISTRATORS AND SUPERINTENDENTS; EMELDA MENENDEZ; GILBERTO MENENDEZ; JOSE OLIVARES; FLORINDA CHAVEZ; JOEY CARDENAS; PROYECTO AZTECA; REFORM IMMIGRATION FOR TEXAS ALLIANCE; WORKERS DEFENSE PROJECT; PAULITA SANCHEZ; JO ANN ACEVEDO; DAVID LOPEZ; DIANA MARTINEZ ALEXANDER; JEANDRA ORTIZ,

*Plaintiffs – Appellants*

*v.*

GREG ABBOTT, IN HIS OFFICIAL CAPACITY AS GOVERNOR OF THE STATE OF TEXAS,

*Defendant – Appellee*

and

LIEUTENANT GOVERNOR DAN PATRICK; SPEAKER OF THE TEXAS HOUSE OF REPRESENTATIVES REP. DADE PHELAN; SEN. JOAN HUFF-MAN; SEN. BRYAN HUGHES; SEN. PAUL BETTENCOURT; SEN. DONNA CAMPBELL; SEN. JANE NELSON; SEN. BRIAN BIRDWELL; SEN. CHARLES PERRY; SEN. ROBERT NICHOLS; SEN. KELLY

HANCOCK; REP. TODD HUNTER; REP. BROOKS LANDGRAF; REP. J.M. LOZANO; REP. JACEY JETTON; REP. RYAN GUILLEN; REP. MIKE SCHOFIELD; REP. ANDREW MURR; REP. DAN HUBERTY; REP. HUGH SHINE; REP. BRAD BUCKLEY; SHARON CARTER; ANNA MACKIN; SEAN OPPERMAN; CHRIS GOBER; COLLEEN GARCIA; ADAM FOLTZ,

*Third-Party Respondents-Appellees*

_____

UNITED STATES OF AMERICA,

*Plaintiff – Appellee*

v.

STATE OF TEXAS; JANE NELSON, IN HER OFFICIAL CAPACITY AS TEXAS SECRETARY OF STATE,

*Defendants-Appellees*

_____

Appeal from the United States District Court for the
Western District of Texas, El Paso Division

_____

**REPLY BRIEF OF PLAINTIFFS-APPELLANTS**

_____

Nina Perales
MEXICAN AMERICAN LEGAL DEFENSE
 AND EDUCATIONAL FUND, INC. (MALDEF)
110 Broadway Street
Suite 300
San Antonio, TX  78205
Tel: (210) 224-5476
Fax: (210) 224-5382

*Counsel for Plaintiffs-Appellants*

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ................................................................ ii

INTRODUCTION.................................................................................1

ARGUMENT .......................................................................................2

I.    The Court Has Jurisdiction Over This Appeal...........................2

    A.    Appellants Filed a Timely Notice of Appeal of the
        District Court's Order ......................................................2

    B.    This Appeal Falls Within the Collateral Order Doctrine...............5

II.    The Scope of the Legislative Privilege Does Not Include
     the Contested Documents and Testimony .....................................7

    A.    Historical Legislative Privilege Did Not Cover the
        Materials in This Dispute .................................................7

    B.    The Disputed Testimony and Documents Fall
        Outside the Scope of the Legislative Privilege.................11

        a.  Information not Shared with a Legislator .................11

        b.  Factual Materials .......................................................14

        c.  Third Parties.............................................................17

        d.  Documents Created Outside the Enactment
        Period.......................................................................18

III.    The Legislative Privilege is Waived .........................................20

IV.    The Legislative Privilege Yields in This Case ...........................23

CONCLUSION....................................................................................24

# <u>TABLE OF AUTHORITIES</u>

Cases                                                                    Page(s)

*Am. Trucking Associations, Inc. v. Alviti*,
   14 F.4th 76 (1st Cir. 2021) ................................................................... 8

*In re N.D. Legis. Assembly*,
   70 F.4th 460 (8th Cir. 2023) ............................................................... 24

*Bethune-Hill v. Virginia State Bd. of Elections*,
   114 F. Supp. 3d 323 (E.D. Va. 2015) ................................................ 24

*Hall v. Hall*,
   584 U.S. 59 (2018) ............................................................................... 4

*In re Hubbard*,
   803 F.3d 1298 (11th Cir. 2015) .......................................................... 17

*In re Sealed Case*,
   121 F.3d 729 (D.C. Cir. 1997) ........................................................... 16

*Indus. Clearinghouse, Inc. v. Browning Mfg. Div. of Emerson Elec. Co.*,
   953 F.2d 1004 (5th Cir. 1992) ............................................................ 23

*Jackson Mun. Airport Auth. v. Harkins*,
   2023 WL 5522213 (5th Cir. Aug. 25, 2023) ...................................... 17

*Jefferson Cmty. Health Care Ctrs., Inc. v. Jefferson Par. Gov't*,
   849 F.3d 615 (5th Cir. 2017) ...................................................... 10, 15

*La Union Del Pueblo Entero v. Abbott*,
   68 F.4th 228 (5th Cir. 2023) ........................................................ Passim

*La Union del Pueblo Entero v. Abbott*,
   93 F.4th 310 (5th Cir. 2024) ........................................................ 18, 24

*Lake Country Estates, Inc. v. Tahoe Reg'l Planning Agency*,
   440 U.S. 391 (1979) ............................................................................. 8

*League of United Latin Am. Citizens v. Abbott*,
   708 F. Supp. 3d 870 (W.D. Tex. 2023) ........................................ 11, 15

*Leonard v. Martin*,
   38 F.4th 481 (5th Cir. 2022) .......................................................... 6, 7

*Mohawk Indus., Inc. v. Carpenter*,
   558 U.S. 100 (2009) ............................................................................. 6

*Montelongo v. Meese*,
   777 F.2d 1097 (5th Cir. 1985) ............................................................. 4

*N. L. R. B. v. Sears, Roebuck & Co.*,
   421 U.S. 132 (1975) ........................................................................... 20

*Pernell v. Florida Bd. Of Governors of State University*,
  84 F.4th 1339 (11th Cir. 2023) ............................................................ 17
*Supreme Court of Virginia v. Consumers Union of U. S., Inc.*
  446 U.S. 719 (1980) ........................................................................... 9
*Tenney v. Brandhove*,
  341 U.S. 367 (1951) ........................................................................... 9
*Turtle Mountain Band of Chippewa Indians v. N. Dakota Legislative Assembly*,
  144 S. Ct. 2709 (2024) ....................................................................... 25
*United States v. Brewster*,
  408 U.S. 501 (1972) ............................................... 9, 10, 19, 23
*United States v. Am. Soc. of Composers, Authors & Publishers*,
  331 F.2d 117 (2d Cir. 1964) ............................................................... 3
*United States v. Bilzerian*,
  926 F.2d 1285 (2d Cir. 1991) ............................................................. 23
*United States v. Conner*,
  907 F.3d 316 (5th Cir. 2018) .............................................................. 3
*United States v. Gillock*,
  445 U.S. 360 (1980) ........................................................................... 8
*United States v. Helstoski*,
  442 U.S. 477 (1979) ........................................................................... 8
*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
  429 U.S. 252 (1977) ..................................................................... 11, 15
*Whole Woman's Health v. Smith*,
  896 F.3d 362 (5th Cir. 2018, revised Jul. 17, 2018) ......................... 5, 6

Rules

Fed. R. App. P. 4(a)(1)(B) ................................................................ 2, 3, 4, 5
Fed. R. App. P. 32(a)(7)(B) .............................................................. 26
Fed. R. App. P. 32(a)(5) ................................................................... 26
Fed. R. App. P. 32(a)(6) ................................................................... 26
Fed. R. App. P. 32(f); and (2) .......................................................... 26
Rule 501 of the Federal Rules of Evidence ...................................... 8

## **INTRODUCTION**

Appellees' arguments depend entirely on the mistaken premise that the legislative privilege bars discovery of legislative intent. On that flawed basis, Appellees argue that discovery material is privileged whenever it might provide evidence of lawmakers' intent, regardless of the material's source or how distant it is from the legislators themselves. In reality, the legislative privilege for state lawmakers is a common-law, qualified, evidentiary privilege that is separate from immunity from legal process.

Once required to do more than reverse-engineer the scope of the legislative privilege to fit the contours of a race discrimination case, Appellees fail to justify the District Court's ruling. Indeed, Appellees' arguments underscore that the District Court erred by radically expanding the scope of the legislative privilege, and also erred by failing to recognize when, even under its own overbroad test, the legislative privilege either didn't apply or was waived.

Focused on the governing law and facts of this case, the District Court's order cannot stand, for several reasons: (1) Appellee legislators (third party respondents below) are not members of Congress and not parties to this case; they cannot rely on the U.S. Constitution's Speech or Debate Clause or legislative *immunity* doctrine to define the scope of the legislative privilege; (2) The scope of the legislative privilege does not turn on the intent of the party that requests discovery, and it does not include

1

all information regarding the intent of lawmakers; (3) The scope of the legislative privilege does not include information never shared with lawmakers, purely fact-based material, information exchanged between legislative outsiders, or material created after lawmakers enacted the challenged legislation; and (4) The legislative privilege is waived when information is made public, by legislators or others, and the legislative privilege should yield, where, as here, the case involves claims of racial discrimination in redistricting.

Appellants thus respectfully request that this Court reverse the District Court's order and remand for further proceedings.

## **ARGUMENT**

## I.     **The Court Has Jurisdiction Over This Appeal**

### A.     **Appellants Filed a Timely Notice of Appeal of the District Court's Order**

Appellees characterize their challenge to the 'timeliness' of the notice of appeal as "arguable" but it is not. Appellees' Response Brief ("Br.") at 15. There is no legal support for Appellees' contention that Fed. R. App. P. 4(a)(1)(B) limits the 60-day deadline to plaintiffs who share pleadings or issues on appeal with the United States. *Id.* at 15-16.

The plain meaning of Rule 4(a)(1)(B) provides otherwise: "The notice of appeal may be filed by any party within 60 days after entry of the judgment or order

appealed from *if one of the parties* is . . . the United States[.]" Fed. R. App. P. 4(a)(1)(B) (emphasis added).

In the Fifth Circuit, "party status [of the United States] [is] the determinant of the 60-day deadline." *United States v. Conner*, 907 F.3d 316, 321 (5th Cir. 2018). Reviewing the 2011 amendments to Rule 4, the Court in *Conner* explained:

> [T]ellingly, the amendments preserved the right of *any* party to file a notice of appeal within the expanded 60-day deadline. In the context of these amendments, which were designed to eliminate traps for the unwary, we read Rule 4(a)(1)(B) to mean what it says: that the 60-day deadline applies if the United States was a party to the lawsuit being appealed, without any additional mandate that it be in a certain posture or possess a certain interest. . . The plain text of Rule 4 after its "safe harbor" provisions were introduced in 2011 only sharpens our conviction that the rule does not smuggle in a "posture" or "interest" requirement—when the government is a party, the 60-day deadline applies, full stop.

*Conner*, 907 F.3d at 321.

The purpose of the 2011 amendments was to address "the greater need for clarity of application when appeal rights are at stake," and include "safe harbor provisions that parties can readily apply and rely upon." *Conner*, 907 F.3d at 320.

Thus, in Rule 4(a)(1)(B), "[t]he stated criterion is whether the United States is a party to the action, a test clearly satisfied here, and not whether the United States is concerned with the particular order sought to be appealed[.]" *United States v. Am. Soc. of Composers, Authors & Publishers*, 331 F.2d 117, 119 (2d Cir. 1964), *cert. denied sub nom Shenandoah Valley Broad. Inc. v. Am. Soc'y of Composers, Authors*

3

*& Publishers*, 377 U.S. 997 (1964); *see also Montelongo v. Meese*, 777 F.2d 1097, 1099 (5th Cir. 1985) (holding that the 60-day period applied when U.S. was co-defendant in original action but did not appeal, and explaining "[i]t is immaterial . . . that the government is not a party or is not interested in the appeal that is actually taken.")

Appellees' interpretation of Fed. R. App. P. 4(a)(1)(B) imposes additional requirements on the Rule:

> The notice of appeal may be filed by any party within 60 days after entry of the judgment or order appealed from if one of the parties is . . . the United States *but only if the United States shared the party's complaint, or the United States appeals the same order, or the United States sought identical relief as that party in the District Court.*

None of that additional language is found in Fed. R. App. P. 4(a)(1)(B). Appellees' interpretation runs contrary to the congressional purpose underlying the 2011 amendments and the plain meaning of the statute.

Appellees cite only one case, *Hall v. Hall*, which does not help them. 584 U.S. 59, 71-72 (2018). *Hall* involved consolidated cases in which two plaintiffs had sued each other; *Hall* held that the plaintiff in one case could file a notice of appeal of an adverse judgment while the other plaintiff's claims remained pending in the trial court. *See Hall*, 584 U.S. at 77 ("What our decision does mean is that constituent cases retain their separate identities at least to the extent that a final

4

decision in one is immediately appealable by the losing party."). *Hall* did not involve the United States as a party, and did not involve Fed. R. App. P. 4(a)(1)(B).

### B.     This Appeal Falls Within the Collateral Order Doctrine

Appellees concede the first two elements of the collateral order doctrine -- that the orders below "could be interpreted as conclusively determining the discovery dispute" and that "this case, like this Court's recent cases addressing the applicability of the legislative privilege, presents an important question separate from the merits of the underlying litigation." Br. at 17 (internal punctuation omitted) (citing *Whole Woman's Health v. Smith*, 896 F.3d 362, 367 (5th Cir. 2018, revised Jul. 17, 2018)).

However, Appellees contend that the collateral order doctrine's third element is not satisfied here because the court's order denied, rather than granted, discovery sought by Plaintiffs. Br. at 18. Appellees maintain that post-trial review is effective here because "[t]he only harm is that the parties may have to retry the case should the [trial court's] ruling be both erroneous and prejudicial." *Id*. But neither case on which Appellees rely involves a question of appellate jurisdiction or review of a civil court interlocutory order.

On the other hand, Appellees rely heavily on *Whole Woman's Health v. Smith*, which concluded that the Court had jurisdiction under the collateral order doctrine. *Id*. at 17-18 (citing *Whole Woman's Health v. Smith*, 896 F.3d 362, 367–68 (5th Cir.

2018, revised Jul. 17, 2018).  *Whole Woman's Health* further observed that where the Court must resolve 'novel' legal issues, it may be appropriate to exercise jurisdiction over the appeal pursuant to the collateral order doctrine.  *Whole Woman's Health v. Smith*, 896 F.3d at 367-68.  Here, as in *Whole Woman's Health*, the court must resolve novel claims of legislative privilege involving:  information never shared with lawmakers; purely fact-based material; information exchanged between legislative outsiders; and material created after lawmakers enacted the challenged legislation.

Appellees' attempt to position themselves as having more at stake than Appellants in this discovery dispute is unavailing.  Both parties to a discovery dispute are similarly situated with respect to the harms of going to trial with (or without) the disputed material, and with respect to the harms of having to retry a case following reversal and remand.  *See Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100, 109 (2009) (discussing retrial following reversal of order compelling discovery); *see also Leonard v. Martin*, 38 F.4th 481, 485 (5th Cir. 2022) (declining to assert jurisdiction under the collateral order doctrine in appeal of order denying nonparty's motion to quash).

To the extent that Appellees claim a harm from having this case tried with the discovery material sought from them by plaintiffs, plaintiffs are similarly harmed by the District Court's denial of that discovery.  *Leonard*, 38 F.4th at 487.

6

And here, in many instances, the lawmakers either did not object to testimony on similar topics by a different witness or never saw the information in the materials in dispute.

## II.   The Scope of the Legislative Privilege Does Not Include the Contested Documents and Testimony

The legislative privilege, under circumstances not applicable to this dispute, can protect legislators from having to testify or produce documents.   But the legislative privilege does not shield lawmakers from having their motives or actions subject to inquiry, and it does not bar discovery simply because the discovered material might reveal legislative intent.

### A.   Historical Legislative Privilege Did Not Cover the Materials in this Dispute

Appellees mischaracterize the historical roots of the state legislative privilege to argue that no party can inquire into legislative motive.   Cherry-picking quotes from criminal prosecutions of federal lawmakers and cases dealing with immunity from suit, Appellees construct an overbroad version of the legislative privilege that, according to them, "shields [all non-public legislative acts] from inquiry" in civil cases.   Br. at 21.   But this interpretation of the legislative privilege stretches it beyond recognition.

Appellees elide the distinction between legislative immunity and legislative privilege when they argue that legislators are "shield[ed] from inquiry[.]"   *Id*. at 21.

Appellees rely primarily on cases involving legislative *immunity* that dealt with federal legislators who were either sued or prosecuted for alleged crimes. *See, e.g.*, *Id*. at 21-22. However, "[l]egislative privilege ... is an evidentiary privilege[ ] governed by federal common law, as applied through Rule 501 of the Federal Rules of Evidence." *La Union Del Pueblo Entero v. Abbott*, 68 F.4th 228, 235 (5th Cir. 2023) ("*Hughes*"). That distinction is important here because the Plaintiffs in this case did not sue Texas legislators; in addition, in many instances, Appellants seek to discover documents and testimony that is not even in lawmakers' possession and does not require legislators' participation.

Appellees strip the context from the cases on which they rely, and conflate immunity with evidentiary privilege. For example, in *U. S. v. Helstoski*, the Court held that the Speech or Debate clause barred federal prosecutors from introducing evidence of past legislative acts to prove a congressman's violation of a bribery statute.[1]  442 U.S. 477, 494 (1979). In *Tenney v. Brandhove*, the Court held that

---

[1] Of note, the Speech or Debate Clause doesn't apply to state legislators. *See, e.g., United States v. Gillock*, 445 U.S. 360, 366 n.5 (1980) (explaining that, "by its terms," "the Federal Speech or Debate Clause ... applies only to 'Senators and Representatives' " of the U.S. Congress, not to "state legislators"); *Lake Country Estates, Inc. v. Tahoe Reg'l Planning Agency*, 440 U.S. 391, 404 (1979) ("The Speech or Debate Clause of the United States Constitution is [not] applicable to the members of state legislatures ...."). Appellees concede as much, but then argue unpersuasively that common law should afford *more* expansive protections to nonparty state legislators. Br. at 22. *But see Am. Trucking Associations, Inc. v. Alviti*, 14 F.4th 76, 87 (1st Cir. 2021) ("the common-law legislative immunity and privilege are less protective than their constitutional counterparts . . . because the

members of Congress are immune from civil suit for holding a legislative hearing.[2] 341 U.S. 367, 379 (1951).  Similarly, in *Supreme Court of Virginia v. Consumers Union of U. S., Inc.*, the Court held that state supreme court justices enjoy "common-law immunity from liability for their legislative acts").  446 U.S. 719, 732 (1980).

However, even in the context of legislative immunity, the Court has recognized important limits.  In *U. S. v. Brewster*, 408 U.S. 501 (1972), the Court held that prosecution of a former Senator for accepting a bribe to perform an official act was not prohibited by the U.S. Constitution's Speech or Debate Clause.  The *Brewster* court rejected the notion that the legislative privilege encompasses "all things in any way related to the legislative process." *Brewster*, 408 U.S. at 516.  The Court explained that it had never "in any sense impl[ied] . . . that everything that 'related' to the office of a [legislator] was shielded by the [Speech or Debate] Clause." *Id*. at 513-14.  The Court also noted that it would be neither "sound [nor] wise, simply out of an abundance of caution to doubly insure legislative independence, to extend the privilege beyond its intended scope, its literal language,

---

separation-of-powers rationale underpinning the Speech or Debate Clause does not apply when it is a state lawmaker claiming legislative immunity or privilege.") (internal citations omitted).

[2] For example, Appellees cite *Tenney* to assert that "the Supreme Court has recognized that the legislative privilege protects legislators when they act 'in the sphere of legitimate legislative activity'" but fail to explain that *Tenney* addressed immunity from suit, not the evidentiary legislative privilege, and held that members of Congress cannot be sued for their legislative acts.  Br. at 22.

and its history, to include all things in any way related to the legislative process." *Id.* at 516.

In their attempt to expand the scope of the legislative privilege, Appellees rely on the wrong cases, and characterize controlling Fifth Circuit precedent as "vague dicta[.]" Br. at 2 (citing *Jefferson Cmty. Health Care Ctrs., Inc. v. Jefferson Par. Gov't*, 849 F.3d 615 (5th Cir. 2017)). On the contrary, *Jefferson* provides the rule here. Read in concert with Supreme Court precedent, *Jefferson* defines a scope of the legislative privilege that protects opinions, motives, recommendations, or advice about legislative decisions. *See Jefferson*, 849 F.3d at 624 ("This privilege 'must be strictly construed and accepted only to the very limited extent that permitting a refusal to testify or excluding relevant evidence has a public good transcending the normally predominant principle of utilizing all rational means for ascertaining the truth.'") (cleaned up).

*Bettencourt* and *Hughes* did not—and could not—disturb Supreme Court precedent or this Court's statements in *Jefferson* that the privilege is qualified and must be strictly construed. To the extent that *Bettencourt* and *Hughes* are inconsistent with *Jefferson*, the Court is required to follow *Jefferson*. *See* ROA.24-50449.24141-24156; *League of United Latin Am. Citizens v. Abbott*, 708 F. Supp. 3d 870, 1232 (W.D. Tex. 2023) (Guaderrama, J., dissenting) ("Under the Fifth Circuit's 'Rule of Orderliness,' 'to the extent that a more recent case' (*Hughes*)

10

'contradicts an older case' (*Jefferson Community*), 'the newer language has no effect.'").

Accordingly, and contrary to Appellees' assertions, the state legislative privilege does not bar "'judicial inquiries into legislative or executive motivation' for their official acts[.]" Br. at 22-23 (quoting *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 268 n.18 (1977)).

## B.     The Disputed Testimony and Documents Fall Outside the Scope of the Legislative Privilege

Appellees construe the scope of the legislative privilege to include any information sought by a party in order to learn "lawmakers' motivations." Br. at 24 (citing ROA.23584). This is an incorrect understanding of the scope of the legislative privilege. The legislative privilege neither turns on the intent of the party that requests discovery, nor does it include all information regarding the intent of lawmakers, and the District Court erred to the extent it applied this vastly overbroad scope. Although the legislative privilege may protect legislators from having to testify about or disclose documents that reveal their motivations in drafting and voting for legislation, the legislative privilege does not bar discovery of other information that can provide evidence relevant to claims of unlawful or unconstitutional motive.

### a.  Information not Shared with a Legislator

Appellees concede that, with respect to documents not shared with a legislator, the legislator must demonstrate that the *information* in the documents was shared with him or her in order for the legislative privilege to apply.  Br. at 30-31 ("a legislator need not have seen a particular *document* to come within the scope of that rule so long as 'someone communicate[s] the content to them within the legislative process.'") (quoting ROA.23584).  Yet many of the documents at issue in this discovery dispute were never shown to legislators and no one claimed that their content was communicated to legislators.  For example, the district court erroneously concluded that the legislative privilege shielded 795 documents created by the Office of the Attorney General for the sole use of its attorneys and never provided to a legislator.  *See* ROA.24-50449.23599.

In another example, the district court erroneously ruled that the legislative privilege barred production of redistricting maps and data in the redistricting computer account of Lt. Governor Dan Patrick, who is not a legislator and performed no legislative acts in redistricting, and despite the fact that no one claimed that Lt. Governor Patrick shared the information with a legislator.  ROA.24-50449.23724.

The District Court also ruled that the legislative privilege shielded disclosure of redistricting data and analysis created by a consultant for a lobbyist—information that was never shared with a legislator.  ROA.24-50449.24250.

12

In their response, Appellees fail to address the fact that the information in these materials was never shared with legislators, and instead argue that the custodians of these materials *could* have communicated their contents to legislators. Br. at 31. But that is not enough. *See Hughes*, 68 F.4th at 235-36 (discussing third parties and emphasizing that the legislative privilege protects "communications" of legislators).

Information not seen by or shared with legislators cannot be legislatively privileged. Appellees' privilege logs make abundantly clear that the custodians of the documents never communicated the information in those documents to legislators. *See e.g.*, ROA.24-50449.19762-19845 (providing careful detail that the documents were "for the sole use of attorney Chris Hilton", "provided directly by staff" at OAG "to attorney Chris Hilton and to no other person within or outside of [OAG], not even the client" and making no mention of whether the information in the documents was ever shared with a legislator.).[3] Nevertheless, the District Court denied the motion to compel these documents. ROA.24-50449.23599.

To the extent that the District Court waived the requirement to show that legislators saw or learned the contents of disputed documents, on the grounds that

---

[3] Contrary to Appellees' assertion, requiring non-legislative custodians of documents to indicate whether the information in those documents was shared with legislators imposes no burdens on legislators. Br. at 33 (arguing that legislators would not be able to "focus on their job" if *non-legislators who never shared information with them* are required to state as much on a privilege log).

all inquiry into legislative motive is barred by the legislative privilege, the District Court clearly erred.  *See, e.g.*, ROA.24-50449.23589.

### b. Factual Materials

Appellees concede that no Fifth Circuit case extends the legislative privilege to purely factual material.  Br. at 25-30.  There are important reasons to exclude this material from the scope of the legislative privilege, first among them that purely factual material does not reflect a legislator's opinions or motives.  Further, requiring the disclosure of fact- based information in no way frustrates the privilege's purposes as articulated by *Hughes*: "separation of powers" and "allowing lawmakers to focus on their jobs[.]"  *Hughes*, 68 F.4th at 237.  Finally, permitting discovery of fact-based material serves the "normally predominant principle of utilizing all rational means for ascertaining the truth."  *Jefferson Cmty. Health Care Centers, Inc.*, 849 F.3d at 624.

For example, the U.S. Supreme Court noted in *Village of Arlington Heights*, without expressing any concern, that the plaintiffs "were allowed, both during the discovery phase and at trial, to question Board members fully about materials and information available to them at the time of decision."  *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 270 n.20 (1977).

Appellees' policy-based argument to extend the legislative privilege to bar discovery of fact-based material is unpersuasive.  First, Appellees assert, in circular

14

fashion, that focusing on whether material reveals a legislator's motives "misses the point" because the scope of legislative privilege should include all material and testimony connected to the legislative process. Br. at 25. Appellees rely on *Hughes* for support, but in *Hughes* the parties "agree[d] that the documents [fell] within the privilege's scope[.]" 68 F.4th at 236. The holding of *Hughes* did not expand the scope of the legislative privilege to include fact-based information.

Second, Appellees' argument starts from the wrong place. The District Court properly recognized that "the legislative privilege does not protect purely factual information." *League of United Latin Am. Citizens v. Abbott*, 708 F. Supp. 3d 870, 877 (W.D. Tex. 2023). Disclosure of fact-based material does not necessarily "disclos[e] *that* the legislator relied on or considered some facts, and not others, [which] would inevitably indicate the legislator's deliberations." *Id*. at 878 (emphasis in original). The appropriate question is whether disclosure of fact-based material requires legislators to reveal what they were thinking, or their motives, when considering or enacting legislation. *See In re Sealed Case*, 121 F.3d 729, 737 (D.C. Cir. 1997) ("The deliberative process privilege does not shield documents that simply state or explain a decision the government has already made or protect material that is purely factual, unless the material is so inextricably intertwined with the deliberative sections of documents that its disclosure would inevitably reveal the government's deliberations.").

Third, Appellees ignore the purposes of the legislative privilege doctrine when they argue that fact-based material is similar to information that lies inside the scope. It is exactly because fact-based material does not reveal a legislator's deliberations that it is distinguishable from information that is protected by the privilege. Appellees argument that fact-based material should fall within the scope of the legislative privilege to avoid "a dichotomy" (Br. at 25) is simply an argument that everything should fall within the scope of the legislative privilege.

Barring discovery of fact-based documents created in the legislative process leads to absurd results, as demonstrated by the District Court's overbroad ruling which barred disclosure of, among other documents: a legislator's calendar entry of a redistricting meeting (ROA.24-50449.23855); a retention letter between an attorney and Lt. Governor Dan Patrick (who is not a legislator and performed no legislative acts) (ROA.24-50449.23743); and an invoice dated in 2019 for expert services sent to a legislator (ROA.24-50449.23640). None of this fact-based material discloses a legislator's subjective intent or motivation. And *Hubbard*, on which Appellees rely, did not deal with the question of whether fact-based material fell within the scope of the legislative privilege. *See In re Hubbard*, 803 F.3d 1298, 1303 n.4 (11th Cir. 2015).[4]

---

[4] Appellees' argument regarding a potential circuit split is misplaced. The Eleventh Circuit created the circuit split; a ruling for Appellants here would not. *Compare Pernell v. Florida Bd. Of Governors of State University*, 84 F.4th 1339, 1343-1344

### c. Third Parties

The District Court erred when it concluded that information is legislatively privileged even when the custodians are consultants to lobbyists, or executive branch officials who by definition cannot be legislative aides. *See* ROA.24-50449.23588. For example, the District Court erroneously expanded the legislative privilege to shield even communications between a lobbyist and his consultant, when there was no showing that a legislator participated in the communication or ever learned of that communication between the lobbyist and his consultant. *See, e.g.*, ROA.24-50449.24262 (classifying, as legislatively privileged, communications in which a lobbyist gave his consultant redistricting files and mapping instructions).

Legislators who communicate with outsiders like lobbyists have no control over what happens to that information next, and can't prevent a lobbyist from passing along that information to more people. The legislative privilege was not developed to shield all of that information without regard to how many people pass it along or how many people ultimately hear of it. *Bettencourt* is not to the contrary. That case dealt with direct communication between legislators and one outside

---

(11th Cir. 2023) (the scope of the legislative privilege turns on the intent of the party requesting discovery) *with Jackson Mun. Airport Auth. v. Harkins*, No. 21-60312, 2023 WL 5522213, at *5 (5th Cir. Aug. 25, 2023) (affirming district court order that legislators produce a privilege log in discovery dispute in case alleging racially discriminatory purpose), *reh'g en banc granted, opinion vacated*, 78 F.4th 844 (5th Cir. 2023) *and on reh'g en banc*, 98 F.4th 144 (5th Cir. 2024) (dismissing appeal as moot).

individual. *See La Union del Pueblo Entero v. Abbott*, 93 F.4th 310, 323 (5th Cir. 2024) ("*Bettencourt*") (concluding that the legislative privilege shields "Vera's emails, which contain the legislators' communications[.]"). *Bettencourt* did not hold that the legislative privilege stretches into an endless game of telephone involving an endless number of legislative outsiders.

Appellees recognize that legislators' communications that are "stored with a third party" are protected by the privilege (Br. at 34 (quoting *Bettencourt* at 319)), but then fail to recognize the difference between those circumstances and the ones here, in which the District Court expanded the legislative privilege to cover communications *between outsiders*, presumably on the off chance that the communication contained somebody's version of what a legislator thought.

### d. Documents Created Outside the Enactment Period

After legislators vote on a bill, they are no longer working on that legislation and documents created outside the time period of considering and enacting legislation are not within the scope of the legislative privilege.

Appellees resist this obvious point, arguing inexplicably that legislators can still be working on a redistricting bill after it is signed into law. Br. at 35 (asserting that legislative acts include "***anything*** 'generally done in a session of the House by one of its members in relation to business before it.'") (emphasis in original) (quoting *Brewster*, 408 U.S. at 509). However, the fact that the Legislature remains

18

in session does not mean that legislators are still formulating or enacting the specific law that is challenged in litigation.

The District Court erred by expanding the legislative privilege to include material created after the enactment of the redistricting legislation at issue in this case. For example, the District Court erred when it classified, as legislatively privileged, communications by a legislator regarding statements about the redistricting process after the Legislature enacted the redistricting plans. ROA.24-50449.23850. Similarly, data and emails created after the enactment of the challenged redistricting plans cannot be "for the purpose of working on redistricting legislation" and cannot be legislatively privileged. *Id*. at .23602. And documents related to a Senator's "response to media inquiries" following enactment of the redistricting legislation is not legislatively privileged. *Id*. At .23713.

As the Supreme Court explained in the context of executive privilege, discovery of post-decision material "is supported not only by the lesser injury to the decisionmaking process flowing from disclosure of post-decisional communications, but also, in the case of those communications which explain the decision, by the increased public interest in knowing the basis for agency policy already adopted." *N. L. R. B. v. Sears, Roebuck & Co.*, 421 U.S. 132, 152 (1975).

While attempting to identify exceptions that would support expansion of the legislative privilege to the time period following passage of a bill, Appellees fail to

explain how the post-enactment material at issue here constitutes "potential legislation" or how it could be related to "the choice not to enact a bill[.]".  Br. at 35-36.  Similarly, while arguing that *Hughes* did not "suggest that the legislative process . . . ends when [a bill] is signed" (Br. at 36-37), Appellees fail entirely to identify the legislative acts Texas legislators performed on the challenged redistricting bills *after* enacting them.

## III.   The Legislative Privilege is Waived

Appellees mischaracterize *Hughes* when they assert that legislators waive the legislative privilege "only when they generally disseminate information to the public."  *Id*. at 38 (citing *Hughes*, 68 F.4th at 236-37).  *Hughes* makes no such ruling, and says only that a legislator can waive the legislative privilege by communicating with "third parties outside the legislative process . . ."  *Hughes* at 237.

Appellees' argument, and the District Court's decision below, flip waiver on its head.  *Hughes* explains that the legislative privilege is preserved when a legislator shares information with a third party whom the legislator brings "*into* the process" by asking for advice or information.  *Hughes* at 237.  *Hughes* does not support the contention that the legislative privilege is preserved when a legislator shares information with the maximum number of people that is just short of "ma[king] the relevant information publicly accessible."  ROA.24-50449.23596; *see also* ROA.24-

50449.23597 (basing the legislative privilege on the "extent of the general public's access to this information . . .").

Sharing information with a person outside the legislative process (*Hughes*) is not the same as sharing it with the-entire-public-minus-one-person, and defining the scope of the legislative privilege based on "the general public's access to this information" creates a limitless privilege.   ROA.24-50449.23596.   The District Court acknowledged that when information is made public, discovery is unnecessary (ROA.24-50449.23587), but did not acknowledge that its ruling—that the legislative privilege bars discovery of all material that is not public— means that plaintiffs can take no intent discovery at all.   Appellees do no better with the same, unavailing, argument.   Br. at 38.

Appellees fail to engage on any level with Appellants' argument that legislators waived the legislative privilege, for testimony and documents from Adam Kincaid and the National Republican Redistricting Trust ("NRRT"), because the legislators did not object to the similar deposition testimony of Chris Gober.   *See* ECF 743 (filed under seal).   Even under the District Court's erroneous "publicly available" standard, legislators cannot assert the legislative privilege over the testimony of Adam Kincaid and NRRT that is similar to Mr. Gober's testimony.   *See* ROA.24-5049.24253-24277 (column titled "Waived in Chris Gober Deposition"), ECF 742 Ex. E (filed under seal), and ECF 743 Ex. 4 (filed under seal).   The District

Court ruled that only one disputed Kincaid deposition excerpt is subject to waiver on the grounds of public release, but the District Court failed to explain why the many other instances in which Chris Gober testified on the same subjects, without objection by legislators, did not waive the legislative privilege for the testimony of Mr. Kincaid and NRRT. *See* ROA.24-50449.24260.[5]

Finally, Appellees do not meaningfully engage with Appellants' argument that legislators, by publicly declaring, in legislative hearings and debates, that they engaged in a "race blind" map drawing process, have waived the legislative privilege with respect to material related to those claims. The District Court observed that partial disclosure constitutes waiver in the attorney-client privilege context, and reasoned that "the rationale for expanding the scope of the waiver in this way extends to the legislative privilege as well." ROA.24-50449.23597 (citing *United States v. Bilzerian*, 926 F.2d 1285, 1292 (2d Cir. 1991) and *Indus. Clearinghouse, Inc. v. Browning Mfg. Div. of Emerson Elec. Co.*, 953 F.2d 1004, 1007 (5th Cir. 1992)). Here, legislators, having declared publicly the favorable portions of their deliberation process (*e.g.*, "race blind" map drawing), cannot assert the legislative

---

[5] Appellees incorrectly write that Appellants support their waiver argument with ROA "cites [to] deposition testimony by Dr. Matthew A. Barreto and Senator Kel Seliger." Br. at 39. Appellees appear to have consulted the wrong Record on Appeal. Appellants' cites are to the ROA in No. 24-50449, the later appeal into which the earlier appeal, No. 24-50128, was consolidated, and Appellants' cites correctly identify portions of the district court opinion below.

privilege to hold back testimony and documents related to those assertions about the

process. *See, e.g.*, *Bilzerian*, 926 F.2d at 1292 ("[T]he attorney-client privilege

cannot at once be used as a shield and a sword.").

## IV.   The Legislative Privilege Yields in This Case

The purpose of legislative immunity, and the legislative privilege, is not "for

the personal or private benefit of Members of Congress, but to protect the integrity

of the legislative process by insuring the independence of individual legislators."

*Brewster,* 408 U.S. at 507.   Where, as here, redistricting litigation challenges the

design of the system in which the Legislature operates, "the natural corrective

mechanisms built into our republican system of government offer little check upon

the very real threat of 'legislative self-entrenchment'[.]" *Bethune-Hill v. Virginia*

*State Bd. of Elections*, 114 F. Supp. 3d 323, 337 (E.D. Va. 2015).

Where, as in discriminatory redistricting, there is a fundamental malfunction

in the legislative process—that is, where legislators have used their office for

personal or private benefit instead of the public good—the legislative privilege

should yield.   Although all cases alleging racial discrimination are significant, racial

discrimination lawsuits related to redistricting constitute "extraordinary instances in

which the legislative privilege must yield." *Hughes*, 68 F.4th at 237 (cleaned up).

Contrary to Appellees' claim, *Bettencourt* did not hold that claims of racial

discrimination in redistricting do not require the legislative privilege to yield.   Br. at

40 (citing *Bettencourt*, 93 F.4th 310 (5th Cir. 2024)).  *Bettencourt* observed that private redistricting lawsuits do not share the characteristics "common to federal criminal prosecutions" but did not rule categorically that the legislative privilege does not yield.  *Bettencourt* at 325.  Similarly, Appellees cannot rely on *In re N.D. Legis. Assembly*, 70 F.4th 460 (8th Cir. 2023) (cited frequently in Appellees' brief) because that decision was vacated by the U.S. Supreme Court four months before Appellees filed their Response.  *See Turtle Mountain Band of Chippewa Indians v. N. Dakota Legislative Assembly*, 144 S. Ct. 2709 (2024).  There is no potential for a circuit split here because no other circuit precedent holds that the legislative privilege categorically does not yield in redistricting cases.

## CONCLUSION

For the foregoing reasons, Appellants respectfully request that the Court reverse the District Court's legislative privilege orders (ROA.24-50449.23583-23942, 24249-24278) and remand for further discovery.

Dated: December 18, 2024              Respectfully submitted,

*/s/ Nina Perales*
Nina Perales
Mexican American Legal
Defense and Educational Fund
110 Broadway, Suite 300
San Antonio, TX  78205
(210) 224-5476
nperales@maldef.org

**CERTIFICATE OF SERVICE**

I hereby certify that on December 18, 2024, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system.  Service will be accomplished by the appellate CM/ECF system.

*/s/ Nina Perales*
Nina Perales

**CERTIFICATE OF COMPLIANCE**

This brief complies with: (1) the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 5,653 words, excluding the parts of the brief exempted by Rule 32(f); and (2) the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Times New Roman font) using Microsoft Word (the same program used to calculate the word count).

*/s/ Nina Perales*
Nina Perales